EAST RIVER STEAMSHIP CORP. ET AL. *v.*
TRANSAMERICA DELAVAL INC.

No. 84–1726.   Argued January 21, 1986—Decided June 16, 1986

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Thomas E. Durkin, Jr.,* argued the cause for petitioners. With him on the briefs were *Clarkson S. Fisher, Jr.,* and *George J. Koelzer.*

*Robert E. Smith,* argued the cause for respondent. With him on the brief were *Norman L. Greene, Barry M. Okun, Maria Echaveste,* and *Waldron Kraemer.**

JUSTICE BLACKMUN delivered the opinion of the Court.

In this admiralty case, we must decide whether a cause of action in tort is stated when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss. The case requires us to consider preliminarily whether admiralty law, which already recognizes a general theory of liability for negligence, also incorporates principles of products liability, including strict liability. Then, charting a course between products liability and contract law, we must determine whether injury to a product itself is the kind of harm that should be protected by products liability or left entirely to the law of contracts.

I

In 1969, Seatrain Shipbuilding Corp. (Shipbuilding), a wholly owned subsidiary of Seatrain Lines, Inc. (Seatrain), announced it would build the four oil-transporting supertankers in issue—the T. T. *Stuyvesant,* T. T. *Williamsburgh,* T. T. *Brooklyn,* and T. T. *Bay Ridge.* Each tanker was constructed pursuant to a contract in which a separate wholly owned subsidiary of Seatrain engaged Shipbuilding. Shipbuilding in turn contracted with respondent, now known as Transamerica Delaval Inc. (Delaval), to design, manufacture, and supervise the installation of turbines (costing $1.4 million each, see App. 163) that would be the main propulsion units for the 225,000-ton, $125 million, *ibid.,* supertankers. When each ship was completed, its title was transferred from the contracting subsidiary to a trust company (as trustee for

---

*Briefs of *amici curiae* urging affirmance were filed for Pott Industries, Inc., by *W. Stanley Walch* and *James W. Erwin;* and for the Product Liability Advisory Council, Inc., et al. by *Herbert Rubin, Michael Hoenig, David B. Hamm, William H. Crabtree,* and *Edward P. Good.*

an owner), which in turn chartered the ship to one of the petitioners, also subsidiaries of Seatrain. Queensway Tankers, Inc., chartered the *Stuyvesant;* Kingsway Tankers, Inc., chartered the *Williamsburgh;* East River Steamship Corp. chartered the *Brooklyn;* and Richmond Tankers, Inc., chartered the *Bay Ridge.* Each petitioner operated under a bareboat charter, by which it took full control of the ship for 20 or 22 years as though it owned it, with the obligation afterwards to return the ship to the real owner. See G. Gilmore & C. Black, Admiralty §§ 4–1, 4–22 (2d ed. 1975). Each charterer assumed responsibility for the cost of any repairs to the ships. Tr. of Oral Arg. 11, 16–17, 35.

The *Stuyvesant* sailed on its maiden voyage in late July 1977. On December 11 of that year, as the ship was about to enter the Port of Valdez, Alaska, steam began to escape from the casing of the high-pressure turbine. That problem was temporarily resolved by repairs, but before long, while the ship was encountering a severe storm in the Gulf of Alaska, the high-pressure turbine malfunctioned. The ship, though lacking its normal power, was able to continue on its journey to Panama and then San Francisco. In January 1978, an examination of the high-pressure turbine revealed that the first-stage steam reversing ring virtually had disintegrated and had caused additional damage to other parts of the turbine. The damaged part was replaced with a part from the *Bay Ridge,* which was then under construction. In April 1978, the ship again was repaired, this time with a part from the *Brooklyn.* Finally, in August, the ship was permanently and satisfactorily repaired with a ring newly designed and manufactured by Delaval.

The *Brooklyn* and the *Williamsburgh* were put into service in late 1973 and late 1974, respectively. In 1978, as a result of the *Stuyvesant's* problems, they were inspected while in port. Those inspections revealed similar turbine damage. Temporary repairs were made, and newly designed parts were installed as permanent repairs that summer.

When the *Bay Ridge* was completed in early 1979, it contained the newly designed parts and thus never experienced the high-pressure turbine problems that plagued the other three ships. Nonetheless, the complaint appears to claim damages as a result of deterioration of the *Bay Ridge*'s ring that was installed in the *Stuyvesant* while the *Bay Ridge* was under construction. In addition, the *Bay Ridge* experienced a unique problem. In 1980, when the ship was on its maiden voyage, the engine began to vibrate with a frequency that increased even after speed was reduced. It turned out that the astern guardian valve, located between the high-pressure and low-pressure turbines, had been installed backwards. Because of that error, steam entered the low-pressure turbine and damaged it. After repairs, the *Bay Ridge* resumed its travels.

## II

The charterers' second amended complaint, filed in the United States District Court for the District of New Jersey, invokes admiralty jurisdiction. It contains five counts alleging tortious conduct on the part of respondent Delaval and seeks an aggregate of more than $8 million in damages for the cost of repairing the ships and for income lost while the ships were out of service. The first four counts, read liberally, allege that Delaval is strictly liable for the design defects in the high-pressure turbines of the *Stuyvesant*, the *Williamsburgh*, the *Brooklyn*, and the *Bay Ridge*, respectively. The fifth count alleges that Delaval, as part of the manufacturing process, negligently supervised the installation of the astern guardian valve on the *Bay Ridge*. The initial complaint also had listed Seatrain and Shipbuilding as plaintiffs and had alleged breach of contract and warranty as well as tort claims. But after Delaval interposed a statute of limitations defense, the complaint was amended and the charterers alone brought the suit in tort. The nonrenewed claims were dismissed with prejudice by the District Court. Delaval then moved

for summary judgment, contending that the charterers' actions were not cognizable in tort.

The District Court granted summary judgment for Delaval, and the Court of Appeals for the Third Circuit, sitting en banc, affirmed. *East River S.S. Corp.* v. *Delaval Turbine, Inc.*, 752 F. 2d 903 (1985). The Court of Appeals held that damage solely to a defective product is actionable in tort if the defect creates an unreasonable risk of harm to persons or property other than the product itself, and harm materializes. Disappointments over the product's quality, on the other hand, are protected by warranty law. *Id.*, at 908, 909–910. The charterers were dissatisfied with product quality: the defects involved gradual and unnoticed deterioration of the turbines' component parts, and the only risk created was that the turbines would operate at a lower capacity. *Id.*, at 909. See *Pennsylvania Glass Sand Corp.* v. *Caterpillar Tractor Co.*, 652 F. 2d 1165, 1169–1170 (CA3 1981). Therefore, neither the negligence claim nor the strict-liability claim was cognizable.

Judge Garth concurred on "grounds somewhat different," 752 F. 2d, at 910, and Judge Becker, joined by Judge Higginbotham, concurred in part and dissented in part. *Id.*, at 913. Although Judge Garth agreed with the majority's analysis on the merits, he found no strict-liability claim presented because the charterers had failed to allege unreasonable danger or demonstrable injury.

Judge Becker largely agreed with the majority's approach, but would permit recovery for a "near miss," where the risk existed but no calamity occurred. He felt that the first count, concerning the *Stuyvesant*, stated a cause of action in tort. The exposure of the ship to a severe storm when the ship was unable to operate at full power due to the defective part created an unreasonable risk of harm.

We granted certiorari to resolve a conflict among the Courts of Appeals sitting in admiralty.[1]  474 U. S. 814 (1985).

### III

### A

Initially, we conclude that the fourth count should have been dismissed because Richmond Tankers, Inc., the charterer of the *Bay Ridge*, lacks standing to bring a claim relating to the defective ring that was removed from the *Bay Ridge* when it was still under construction.  The ring was installed in the *Stuyvesant* where it remained until April 1978, when it was removed due to disintegration.  Richmond did not charter the *Bay Ridge* until May 1979, after the ship was completed with a newly designed, nondefective, high-pressure turbine.  See Plaintiffs' Answers to First Set of Interrogatories of Defendants, No. 42.  Richmond therefore can allege no cognizable injury.  *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975).  Richmond, of course, has standing to bring the claim raised in the fifth count, as the damage from the reverse installation of the astern guardian valve allegedly occurred after Richmond chartered the *Bay Ridge*.

### B

The torts alleged in the first, second, third, and fifth counts clearly fall within the admiralty jurisdiction.  The claims satisfy the traditional "locality" requirement—that the wrong

---

[1] Compare *East River S.S. Corp.* v. *Delaval Turbine, Inc.*, 752 F. 2d 903 (CA3 1985) (en banc) (this case), with *Ingram River Equipment, Inc.* v. *Pott Industries, Inc.*, 756 F. 2d 649 (CA8 1985), cert. pending, No. 85–12; *Miller Industries* v. *Caterpillar Tractor Co.*, 733 F. 2d 813 (CA11 1984); *Emerson G. M. Diesel, Inc.* v. *Alaskan Enterprise*, 732 F. 2d 1468 (CA9 1984).  See also *Pan-Alaska Fisheries, Inc.* v. *Marine Constr. & Design Co.*, 565 F. 2d 1129 (CA9 1977); and *Jig The Third Corp.* v. *Puritan Marine Ins. Underwriters Corp.*, 519 F. 2d 171 (CA5 1975).  Cf. *Louisiana ex rel. Guste* v. *M/V Testbank*, 752 F. 2d 1019 (CA5 1985) (en banc), cert. pending *sub nom. White* v. *M/V Testbank*, No. 84–1808.

must have occurred on the high seas or navigable waters. See, *e. g., The Plymouth,* 3 Wall. 20, 35–36 (1866). The first and fifth counts allege that the injury to the *Stuyvesant*'s high-pressure turbine and the *Bay Ridge*'s low-pressure turbine occurred while the ships were sailing on the high seas. The damage to the *Williamsburgh* and the *Brooklyn,* alleged in the second and third counts, occurred at sea, and was discovered in port, also a maritime locale. See *Southern S.S. Co.* v. *NLRB,* 316 U. S. 31, 41 (1942).

When torts have occurred on navigable waters within the United States, the Court has imposed an additional requirement of a "maritime nexus"—that the wrong must bear "a significant relationship to traditional maritime activity." See *Executive Jet Aviation, Inc.* v. *Cleveland,* 409 U. S. 249, 268 (1972); *Foremost Ins. Co.* v. *Richardson,* 457 U. S. 668 (1982). We need not reach the question whether a maritime nexus also must be established when a tort occurs on the high seas. Were there such a requirement, it clearly was met here, for these ships were engaged in maritime commerce, a primary concern of admiralty law.

## C

With admiralty jurisdiction comes the application of substantive admiralty law. See *Executive Jet Aviation,* 409 U. S., at 255. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies. *United States* v. *Reliable Transfer Co.,* 421 U. S. 397, 409 (1975); *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149, 160–161 (1920). Drawn from state[2] and federal sources, the general

---

[2] The charterers do not ask us to defer to the law of New Jersey, the forum State. Nor is application of state-law principles required here. New Jersey lacks any "pressing and significant" interest in the tort action. See *Kossick* v. *United Fruit Co.,* 365 U. S. 731, 739 (1961). In any event, reliance on state law would not help the charterers' case, since it mandates the same conclusion reached by the District Court and the Court of Appeals: that Delaval had no tort duty to the charterers. See *Spring Motors*

maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules. See *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U. S. 625, 630 (1959); *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 373–375 (1959). This Court has developed a body of maritime tort principles, see, *e. g.*, *Kermarec*, *supra*, at 632; see generally Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960 S. Ct. Rev. 158, 164, and is now asked to incorporate products-liability concepts, long a part of the common law of torts, into the general maritime law. See *Igneri* v. *Cie. de Transports Oceaniques*, 323 F. 2d 257, 260 (CA2 1963), cert. denied, 376 U. S. 949 (1964).

The Courts of Appeals sitting in admiralty overwhelmingly have adopted concepts of products liability, based both on negligence, *Sieracki* v. *Seas Shipping Co.*, 149 F. 2d 98, 99–100 (CA3 1945), aff'd on other grounds, 328 U. S. 85 (1946), and on strict liability, *Pan-Alaska Fisheries, Inc.* v. *Marine Constr. & Design Co.*, 565 F. 2d 1129, 1135 (CA9 1977) (adopting Restatement (Second) of Torts § 402A (1965)). Indeed, the Court of Appeals for the Third Circuit previously had stated that the question whether principles of strict products liability are part of maritime law "is no longer seriously contested." *Ocean Barge Transport Co.* v. *Hess Oil Virgin Islands Corp.*, 726 F. 2d 121, 123 (1984) (citing cases).

We join the Courts of Appeals in recognizing products liability, including strict liability, as part of the general maritime law. This Court's precedents relating to injuries of maritime workers long have pointed in that direction. See *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85, 94 (1946) (strict liability for unseaworthiness); *Italia Societa per Azioni di Navigazione* v. *Oregon Stevedoring Co.*, 376 U. S. 315, 322 (1964) (strict liability for breach of implied warranty of work-

---

*Distributors, Inc.* v. *Ford Motor Co.*, 98 N. J. 555, 579, 489 A. 2d 660, 672 (1985).

manlike service). The Court's rationale in those cases —that strict liability should be imposed on the party best able to protect persons from hazardous equipment —is equally applicable when the claims are based on products liability. Compare *Sieracki*, 328 U. S., at 93–94, with *Escola* v. *Coca Cola Bottling Co. of Fresno*, 24 Cal. 2d 453, 462, 150 P. 2d 436, 441 (1944) (concurring opinion). And to the extent that products actions are based on negligence, they are grounded in principles already incorporated into the general maritime law. See *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U. S., at 632. Our incorporation of products liability into maritime law, however, is only the threshold determination to the main issue in this case.

## IV

Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty. See *Seely* v. *White Motor Co.*, 63 Cal. 2d 9, 15, 403 P. 2d 145, 149 (1965). It is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort. See G. Gilmore, The Death of Contract 87–94 (1974). We must determine whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation.

## A

The paradigmatic products-liability action is one where a product "reasonably certain to place life and limb in peril," distributed without reinspection, causes bodily injury. See, *e. g., MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382, 389, 111 N. E. 1051, 1053 (1916). The manufacturer is liable whether or not it is negligent because "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Escola* v. *Coca Cola Bot-*

*tling Co. of Fresno*, 24 Cal. 2d, at 462, 150 P. 2d, at 441 (opinion concurring in judgment).

For similar reasons of safety, the manufacturer's duty of care was broadened to include protection against property damage. See *Marsh Wood Products Co.* v. *Babcock & Wilcox Co.*, 207 Wis. 209, 226, 240 N. W. 392, 399 (1932); *Genesee County Patrons Fire Relief Assn.* v. *L. Sonneborn Sons, Inc.*, 263 N. Y. 463, 469–473, 189 N. E. 551, 553–555 (1934). Such damage is considered so akin to personal injury that the two are treated alike. See *Seely* v. *White Motor Co.*, 63 Cal. 2d, at 19, 403 P. 2d, at 152.

In the traditional "property damage" cases, the defective product damages other property. In this case, there was no damage to "other" property. Rather, the first, second, and third counts allege that each supertanker's defectively designed turbine components damaged only the turbine itself. Since each turbine was supplied by Delaval as an integrated package, see App. 162–163, each is properly regarded as a single unit. "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." *Northern Power & Engineering Corp.* v. *Caterpillar Tractor Co.*, 623 P. 2d 324, 330 (Alaska 1981). The fifth count also alleges injury to the product itself. Before the high-pressure and low-pressure turbines could become an operational propulsion system, they were connected to piping and valves under the supervision of Delaval personnel. See App. 78, 162–163, 181. Delaval's supervisory obligations were part of its manufacturing agreement. The fifth count thus can best be read to allege that Delaval's negligent manufacture of the propulsion system—by allowing the installation in reverse of the astern guardian valve—damaged the propulsion system. Cf. *Lewis* v. *Timco, Inc.*, 736 F. 2d 163, 165–166 (CA5 1984). Obviously, damage to a product itself

has certain attributes of a products-liability claim. But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.

## B

The intriguing question whether injury to a product itself may be brought in tort has spawned a variety of answers.[3] At one end of the spectrum, the case that created the majority land-based approach, *Seely* v. *White Motor Co.*, 63 Cal. 2d 9, 403 P. 2d 145 (1965) (defective truck), held that preserving a proper role for the law of warranty precludes imposing tort liability if a defective product causes purely monetary harm. See also *Jones & Laughlin Steel Corp.* v. *Johns-Manville Sales Corp.*, 626 F. 2d 280, 287, and n. 13 (CA3 1980) (citing cases).

At the other end of the spectrum is the minority land-based approach, whose progenitor, *Santor* v. *A & M Karagheusian, Inc.*, 44 N. J. 52, 66–67, 207 A. 2d 305, 312–313 (1965) (marred carpeting), held that a manufacturer's duty to make nondefective products encompassed injury to the product it-

---

[3] The question is not answered by the Restatement (Second) of Torts §§ 395 and 402A (1965), or by the Uniform Commercial Code, see Wade, Is Section 402A of the Second Restatement of Torts Preempted by the UCC and Therefore Unconstitutional?, 42 Tenn. L. Rev. 123 (1974).

Congress, which has considered adopting national products-liability legislation, also has been wrestling with the question whether economic loss should be recoverable under a products-liability theory. See 1 L. Frumer & M. Friedman, Products Liability § 4C (1986). When S. 100, 99th Cong., 1st Sess. (1985) (the Product Liability Act) was introduced, it excluded, § 2(6), recovery for commercial loss. Suggestions have been made for revising this provision. See Amendment 16, 131 Cong. Rec. 5461 (1985); Amendment 100, *id.*, at 11850, 11851. Other bills also have addressed the issue. See S. 1999, *id.*, at 38772 (1985); Amendment 1951, 132 Cong. Rec. 10304 (1986). See also H. R. 2568, 99th Cong., 1st Sess. (1985); H. R. 4425, 99th Cong., 2d Sess. (1986).

The issue also is of concern in the area of conflict of laws. See R. Weintraub, Commentary on the Conflict of Laws § 6.29 (2d ed. 1980).

self, whether or not the defect created an unreasonable risk of harm.[4] See also *LaCrosse* v. *Schubert, Schroeder & Associates, Inc.*, 72 Wis. 2d 38, 44–45, 240 N. W. 2d 124, 127–128 (1976). The courts adopting this approach, including the majority of the Courts of Appeals sitting in admiralty that have considered the issue,[5] *e. g.*, *Emerson G. M. Diesel, Inc.* v. *Alaskan Enterprise*, 732 F. 2d 1468 (CA9 1984), find that the safety and insurance rationales behind strict liability apply equally where the losses are purely economic. These courts reject the *Seely* approach because they find it arbitrary that economic losses are recoverable if a plaintiff suffers bodily injury or property damage, but not if a product injures itself. They also find no inherent difference between economic loss and personal injury or property damage, because all are proximately caused by the defendant's conduct. Further, they believe recovery for economic loss would not lead to unlimited liability because they think a manufacturer can predict and insure against product failure. See *Emerson G. M. Diesel, Inc.* v. *Alaskan Enterprise*, 732 F. 2d, at 1474.

Between the two poles fall a number of cases that would permit a products-liability action under certain circumstances when a product injures only itself. These cases attempt to differentiate between "the disappointed users . . . and the

---

[4] Interestingly, the New Jersey and California Supreme Courts have each taken what appears to be a step in the direction of the other since *Santor* and *Seely*. In *Spring Motors Distributors, Inc.* v. *Ford Motor Co.*, 98 N. J., at 579, 489 A. 2d, at 672, the New Jersey court rejected *Santor* in the commercial context. And in *J'Aire Corp.* v. *Gregory*, 24 Cal. 3d 799, 598 P. 2d 60 (1979), the California court recognized a cause of action for negligent interference with prospective economic advantage.

[5] Most of the admiralty cases concerned fishing vessels. See *Emerson G. M. Diesel, Inc.* v. *Alaskan Enterprise*, 732 F. 2d 1468, 1472 (CA9 1984) (relying on solicitude for fishermen as a reason for a more protective approach). Delaval concedes that the courts, see *Carbone* v. *Ursich*, 209 F. 2d 178, 182 (CA9 1953), and Congress, see 46 U. S. C. App. § 533 (1982 ed., Supp. II), at times have provided special protection for fishermen. This case involves no fishermen.

endangered ones," *Russell* v. *Ford Motor Co.*, 281 Ore. 587, 595, 575 P. 2d 1383, 1387 (1978), and permit only the latter to sue in tort. The determination has been said to turn on the nature of the defect, the type of risk, and the manner in which the injury arose. See *Pennsylvania Glass Sand Corp.* v. *Caterpillar Tractor Co.*, 652 F. 2d, at 1173 (relied on by the Court of Appeals in this case). The Alaska Supreme Court allows a tort action if the defective product creates a situation potentially dangerous to persons or other property, and loss occurs as a proximate result of that danger and under dangerous circumstances. *Northern Power & Engineering Corp.* v. *Caterpillar Tractor Co.*, 623 P. 2d 324, 329 (1981).

We find the intermediate and minority land-based positions unsatisfactory. The intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior. Nor do we find persuasive a distinction that rests on the manner in which the product is injured. We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. Compare *Morrow* v. *New Moon Homes, Inc.*, 548 P. 2d 279 (Alaska 1976), with *Cloud* v. *Kit Mfg. Co.*, 563 P. 2d 248, 251 (Alaska 1977). But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law. See E. Farnsworth, Contracts § 12.8, pp. 839–840 (1982).

We also decline to adopt the minority land-based view espoused by *Santor* and *Emerson*. Such cases raise legitimate questions about the theories behind restricting products liability, but we believe that the countervailing arguments are more powerful. The minority view fails to account for the

need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages.

## C

Exercising traditional discretion in admiralty, see *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406, 409 (1953), we adopt an approach similar to *Seely* and hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.[6]

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." *Seely* v. *White Motor Co.*, 63 Cal. 2d, at 18, 403 P. 2d, at 151. When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.

The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. *Escola* v. *Coca Cola Bottling Co.*, 24 Cal. 2d, at 462, 150 P. 2d, at 441 (opinion concurring in judgment). In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be in-

---

[6] We do not reach the issue whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic. Cf. *Ultramares Corp.* v. *Touche*, 255 N. Y. 170, 174 N. E. 441 (1931). But see *Robins Dry Dock & Repair Co.* v. *Flint*, 275 U. S. 303 (1927).

sured.   See 10A G. Couch, Cyclopedia of Insurance Law §§ 42:385–42:401, 42:414–417 (2d ed. 1982);· 7 E. Benedict, Admiralty, Form No. 1.16–7, p. 1–239 (7th ed. 1985); 5A J. Appleman & J. Appleman, Insurance Law and Practice § 3252 (1970).   Society need not presume that a customer needs special protection.   The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.   Cf. *United States* v. *Carroll Towing Co.*, 159 F. 2d 169, 173 (CA2 1947).

Damage to a product itself is most naturally understood as a warranty claim.   Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."   See J. White & R. Summers, Uniform Commercial Code 406 (2d ed. 1980).   The maintenance of product value and quality is precisely the purpose of express and implied warranties.[7]   See UCC § 2–313 (express warranty), § 2–314 (implied warranty of merchantability), and § 2–315 (warranty of fitness for a particular purpose).   Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action.   Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.   See UCC §§ 2–601, 2–608, 2–612.

Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own

---

[7] If the charterers' claims were brought as breach-of-warranty actions, they would not be within the admiralty jurisdiction.   Since contracts relating to the construction of or supply of materials to a ship are not within the admiralty jurisdiction, see *Thames Towboat Co.* v. *The Schooner "Francis McDonald"*, 254 U. S. 242, 243 (1920); *Kossick* v. *United Fruit Co.*, 365 U. S., at 735, neither are warranty claims grounded in such contracts. See 1 E. Benedict, Admiralty § 188, p. 11–36 (7th ed. 1985).   State law would govern the actions.   See *North Pacific S.S. Co.* v. *Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U. S. 119, 127 (1919).   In particular the Uniform Commercial Code, which has been adopted by 49 States, would apply.

agreements.[8] The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. See UCC §§ 2–316, 2–719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, cf. *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N. J. 358, 161 A. 2d 69 (1960), we see no reason to intrude into the parties' allocation of the risk.

While giving recognition to the manufacturer's bargain, warranty law sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain. See White & Summers, *supra*, ch. 10. The expectation damages available in warranty for purely economic loss give a plaintiff the full benefit of its bargain by compensating for forgone business opportunities. See Fuller & Perdue, The Reliance Interest in Contract Damages: 1, 46 Yale L. J. 52, 60–63 (1936); R. Posner, Economic Analysis of Law § 4.8 (3d ed. 1986). Recovery on a warranty theory would give the charterers their repair costs and lost profits, and would place them in the position they would have been in had the turbines functioned properly.[9] See *Hawkins* v. *McGee*, 84 N. H. 114, 146 A. 641

---

[8] We recognize, of course, that warranty and products liability are not static bodies of law and may overlap. In certain situations, for example, the privity requirement of warranty has been discarded. *E. g.*, *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N. J. 358, 380–384, 161 A. 2d 69, 81–84 (1960). In other circumstances, a manufacturer may be able to disclaim strict tort liability. See, *e. g.*, *Keystone Aeronautics Corp.* v. *R. J. Enstrom Corp.*, 499 F. 2d 146, 149 (CA3 1974). Nonetheless, the main currents of tort law run in different directions from those of contract and warranty, and the latter seem to us far more appropriate for commercial disputes of the kind involved here.

[9] In contrast, tort damages generally compensate the plaintiff for loss and return him to the position he occupied before the injury. Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579, 584–586, 588, n. 6, 296 N. E. 2d 183, 187–188, 189, n. 6 (1973); Prosser, The Borderland of Tort and Contract, in Selected Topics on the Law of Torts 380, 424–427 (Thomas M. Cooley Lectures, Fourth Series 1953). Tort damages are analogous to reliance damages, which are awarded in contract when there is particular difficulty in mea-

(1929). Thus, both the nature of the injury and the resulting damages indicate it is more natural to think of injury to a product itself in terms of warranty.

A warranty action also has a built-in limitation on liability, whereas a tort action could subject the manufacturer to damages of an indefinite amount. The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach. See *Hadley* v. *Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854). In a warranty action where the loss is purely economic, the limitation derives from the requirements of foreseeability and of privity, which is still generally enforced for such claims in a commercial setting. See UCC § 2–715; White & Summers, *supra,* at 389, 396, 406–410.

In products-liability law, where there is a duty to the public generally, foreseeability is an inadequate brake. Cf. *Kinsman Transit Co.* v. *City of Buffalo,* 388 F. 2d 821 (CA2 1968). See also Perlman, Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, 49 U. Chi. L. Rev. 61, 71–72 (1982). Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product. In this case, for example, if the charterers—already one step removed from the transaction—were permitted to recover their economic losses, then the companies that subchartered the ships might claim their economic losses from the delays, and the charterers' customers also might claim their economic losses, and so on. "The law does not spread its protection so far." *Robins Dry Dock & Repair Co.* v. *Flint,* 275 U. S. 303, 309 (1927).

---

suring the expectation interest. See, *e. g., Security Stove & Mfg. Co.* v. *American Railways Express Co.,* 227 Mo. App. 175, 51 S. W. 2d 572 (1932).

And to the extent that courts try to limit purely economic damages in tort, they do so by relying on a far murkier line, one that negates the charterers' contention that permitting such recovery under a prcducts-liability theory enables admiralty courts to avoid difficult line drawing. Cf. *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 174 N. E. 441 (1931); *Louisiana ex rel. Guste* v. *M/V Testbank,* 752 F. 2d 1019, 1046–1052 (CA5 1985) (en banc) (dissenting opinion), cert. pending *sub nom. White* v. *M/V Testbank,* No. 84–1808.

## D

For the first three counts, the defective turbine components allegedly injured only the turbines themselves. Therefore, a strict products-liability theory of recovery is unavailable to the charterers. Any warranty claims would be subject to Delaval's limitation, both in time and scope, of its warranty liability. App. 78–79. The record indicates that Seatrain and Delaval reached a settlement agreement. Deposition of Stephen Russell, p. 32. We were informed that these charterers could not have asserted the warranty claims. See Tr. of Oral Arg. 36. Even so, the charterers should be left to the terms of their bargains, which explicitly allocated the cost of repairs.

In the charterers' agreements with the owners, the charterers took the ships in "as is" condition, after inspection, and assumed full responsibility for them, including responsibility for maintenance and repairs and for obtaining certain forms of insurance. *Id.,* at 11, 16–17, 35; App. 86, 88, 99, 101, 112, 114, 125–126, 127. In a separate agreement between each charterer and Seatrain, Seatrain agreed to guarantee certain payments and covenants by each charterer to the owner. *Id.,* at 142–156. The contractual responsibilities thus were clearly laid out. There is no reason to extricate the parties from their bargain.

Similarly, in the fifth count, alleging the reverse installation of the astern guardian valve, the only harm was to the

propulsion system itself rather than to persons or other property. Even assuming that Delaval's supervision was negligent, as we must on this summary judgment motion, Delaval owed no duty under a products-liability theory based on negligence to avoid causing purely economic loss. Cf. *Flintkote Co.* v. *Dravo Corp.*, 678 F. 2d 942 (CA11 1982); *S. M. Wilson & Co.* v. *Smith International, Inc.*, 587 F. 2d 1363 (CA9 1978). Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss.

While we hold that the fourth count should have been dismissed, we affirm the entry of judgment for Delaval.

*It is so ordered.*