**ALL ALASKAN SEAFOODS, INC.; AAS–DMP Management Partnership; Kodiak Marine Protein, Inc., General Partner AAS–DMP; Dalmoreproduct, Holding Company; Shin Nihon Global Company, Ltd., Plaintiffs–Appellants,**

**v.**

**RAYCHEM CORPORATION, Defendant-third-party-plaintiff-Appellee,**

**and**

**Minnesota Mining & Manufacturing Company, Defendant–Appellee,**

**v.**

**Marine Electric, Inc., Third–party–Defendant.**

**No. 98–35540.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1999

Filed Dec. 7, 1999

Jonathan P. Meier, Sirianni & Yountz (argued), Seattle, Washington; Steven B. Fisher, Daar, Fisher, Kanaris & Vanek, P.C. (on the briefs), Chicago, Illinois; and Michael H. Williamson, Madden, Poliak, MacDougall & Williamson (on the briefs), Chicago, Illinois, for the plaintiffs-appellants.

Gregory S. Gilchrist, Legal Strategies Group (argued); Emeryville, California; Robert N. Windes, Le Gros, Buchanan & Paul (on the briefs), Seattle, Washington; and Daniel J. Gunter, Graham & James LLP/Riddell Williams P.S. (on the briefs), Seattle, Washington, for the defendants-appellees.

Before: REAVLEY,[1] BOOCHEVER, and TROTT, Circuit Judges.

REAVLEY, Circuit Judge:

Appellant AAS–DMP Management Partnership ("AAS–DMP") appeals the judgment in favor of appellees Raychem Corporation ("Raychem") and Minnesota Mining & Manufacturing Co. ("3M"). The district court granted summary judgment for appellees on appellant's claims for product liability arising from a fire aboard the P/V ALL ALASKAN. We reverse and remand.

The following facts are not in dispute. In 1987, All Alaskan Seafoods, Inc. ("All Alaskan") purchased the hull of an oil drill ship, then spent over $25,000,000.00 to build a seafood processing factory on the hull, and named the vessel P/V ALL ALASKAN. All Alaskan built the vessel for its own use and operated the vessel in the Bering Sea to process salmon and crab meat. The first season of operation began in June, 1989. Before the second season, All Alaskan purchased Raychem heating

---

1. The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

cable in bulk and installed some of the cable on a new drain line on the vessel. An end cap manufactured by 3M was installed on the end of the Raychem heating cable. On July 5, 1994, after operating the ship for another four seasons, All Alaskan transferred title of the ship "as is where is" to AAS–DMP, created for a joint venture between All Alaskan and a Russian entity, Dalmoreproduct Holding Company. The P/V ALL ALASKAN caught fire on July 24, 1994 while operating in Bristol Bay and suffered substantial damage in the fire.

AAS–DMP alleges that the fire was caused by defects in the Raychem heating cable and the 3M end cap installed between the first and second fishing seasons. The district court granted summary judgment on the ground that under the rule of *East River S.S. Corp. v. Transamerica Delaval, Inc.*[2] AAS–DMP could not recover in product liability for economic loss to the vessel.

The Supreme Court in *East River* recognized product liability, including strict liability, as part of the general maritime law, but the Court limited that liability where a defect damages only the product itself. In *East River*, defective turbine components damaged only the turbine and interrupted the commercial operation of the vessel. The bareboat charterer of the vessel sought damages in product liability from the turbine manufacturer. The Court restricted this claim to the contractual warranty between the manufacturer and the purchaser, and held that, in the absence of a contractual obligation, a commercial product injuring itself is not the kind of harm against which public policy requires manufacturers to protect. The Court focused on the exposure of the product manufacturer and held "that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871,

106 S.Ct. at 2302. The Court explained that warranty law sufficiently protects a purchaser by allowing the purchaser to obtain the benefit of his or her bargain. "Thus ... it is more natural to think of injury to a product itself in terms of warranty." 476 U.S. at 873, 106 S.Ct. at 2295.

The Court applied the *East River* rule in *Saratoga Fishing Co. v. J.M. Martinac & Co.*,[3] in which Joseph Madruga purchased a vessel built by J.M. Martinac, then added equipment to the vessel before reselling it to Saratoga Fishing. A defect in the hydraulic system caused a fire and the vessel was lost. Saratoga Fishing recovered for the skiff, nets, and spare parts added to the ship by Madruga. The Court rejected the view of the dissent and the Ninth Circuit that would define the "product" for the purposes of the *East River* economic loss rule as the object of the purchaser's bargain. Instead the Court retained the distinction between components incorporated by a manufacturer before sale to an initial user and those items added by a user of the manufactured product.

The case at bar raises questions in maritime law which have not been addressed. Who is the manufacturer and who is the initial user? What is the "product" for which a tort claim is limited? The Court has not said whether the seller should be considered a manufacturer for *East River* purposes when, as in the case of All Alaskan, it refurbishes and operates a vessel for its own business before selling the vessel. Likewise, it has not been decided whether *East River* has any application where the vessel is not sold new or is sold in a commercial transaction where a warranty is not likely; and if *East River* does not apply in those circumstances, how the "product" is to be determined. We believe that the boundary set by the *East River* rationale is best observed by treating All Alaskan as a user, not a manufac-

---

**2.** 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

**3.** 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997)

turer, and by treating the items sold by Raychem and 3M as products. The P/V ALL ALASKAN was not the "product" for *East River* purposes during the four years it was operated by All Alaskan after installation of the heating cable and end cap. We see no justification for changing the characterization of the product upon the sale to AAS–DMP, nor for immunizing Raychem and 3M from tort liability because of the transaction between All Alaskan and AAS–DMP.

Product liability promotes safer products by placing responsibility on the manufacturer, which is the party most able to prevent harm. *See Saratoga Fishing,* 520 U.S. at 881, 117 S.Ct. at 1787; *East River,* 476 U.S. at 866, 106 S.Ct. at 2300. Product liability law provides manufacturers with incentives to determine design and quality control specifications in light of the potential exposure to liability for defects. RESTATEMENT THIRD, TORTS: PRODS. LIAB. § 2 cmt. a (1997). Manufacturers can set prices to spread the risk of defects over the entire market for their products. *Id.*

■ The economic loss rule serves as a boundary at the intersection of contract and tort law to protect the law of warranty from being absorbed in tort. *East River,* 476 U.S. at 866–68, 106 S.Ct. at 2300. Under that rule when a defective product damages itself, the only loss is the value of the product, which is the subject of warranty rather than tort law. *Id.* Protecting warranty regimes from incursions by tort law is important because manufacturers rely on limitations of warranty to make financial decisions regarding costs for product failure. Product liability law provides notice to manufacturers that warranty limitations may not protect against exposure when a defective product causes personal injury or property damage, but the economic loss rule allows reliance on warranty for damage the product causes to itself.

A corollary to the economic loss rule is the component part rule, the principles of which can be extrapolated from the princi-

ples of the economic loss rule. Manufacturers of integrated products can avail themselves of warranty provisions and can spread the risk of product defect over their entire market. Manufacturers replace or repair products according to their warranties as a normal part of doing business. When purchasing component parts, integrated product manufacturers can exercise market power to negotiate price and allocation of downstream risks of defective components. *See Saratoga Fishing,* 520 U.S. at 884, 117 S.Ct. at 1788. Because integrated product manufacturers use the same components in multiple iterations of the same product, economies of scale exist to support investigation and testing of component suppliers' products. Alternatively, integrated product manufacturers can exercise market power to impose specifications on component suppliers. *Id.* Component part suppliers can evaluate exposure to downstream risk for component failure by reference to the risk allocation with the integrated product manufacturer and the warranty provisions for the integrated product. *Id.*

Appellees Raychem and 3M qualify as manufacturers of mass produced products, therefore the principles of product liability law apply to their sale of the cable and end cap. Appellees are in the best position to know the risks created by the design and manufacture of their products and can best protect against the failure of their products. Appellees can spread the cost of product failures and can limit their exposure for product failure through warranty. Appellees are on notice of the product liability risks associated with the normal use of the these products.

The principles underlying the protection of component part manufacturers do not apply to the use of these products in the P/V ALL ALASKAN. Appellees did not sell these products in a bulk component part transaction with a mass producer of integrated products, therefore the price did not reflect any alteration of normal product liability exposure. Appellees did

not have any reason to expect that the sale of these products would be insulated from product liability exposure because there was no negotiated allocation of risk or subsequent warranty of a mass-produced integrated product. There is no rational basis for immunizing appellees from product liability solely because the vessel was transferred to appellant after initial use. *See Saratoga Fishing*, 520 U.S. at 881, 882, 117 S.Ct. at 1787.

The principles applicable to manufacturers of integrated products do not apply to the assembly of the P/V ALL ALASKAN by All Alaskan. All Alaskan is not in the business of selling vessels of this type. All Alaskan was not in the position to spread the risk of a component defect over several vessel sales. All Alaskan purchased these components off the shelf from manufacturers with reliable reputations. The cable and end caps were not acquired in a negotiated allocation of downstream risk. Unlike a mass producer of integrated products, All Alaskan was not in the position to exercise market power to impose manufacturing specifications for the cable and end caps as component parts. All Alaskan relied on the manufacturing and design expertise of appellees.

Appellees had every reason to expect that these products created a risk of property damage exposure such as the fire aboard the P/V ALL ALASKAN. Appellees have reason to expect limitation of this exposure only when their products are incorporated into integrated products for sale by a manufacturer. When appellees' products are used in vessels such as the P/V ALL ALASKAN, appellees can only expect the economic loss rule to prevent recovery for the cable or end cap damaging themselves. But for the fortuity of the transfer of the vessel's title, the economic loss rule would not be an issue. The Court has expressly disapproved the immunization of a manufacturer from product liability solely by virtue of a fortuitous transfer. *Id.*

Under the principles of product liability, the cable and end cap are products and not components in this case. The transfer of the vessel to AAS–DMP provides no justification for changing the characterization of the vessel and these products.

■ Appellee 3M raises an entirely different issue in this appeal, arguing that appellant has abandoned or waived its claims with regard to 3M because appellant's opening brief focuses exclusively on Raychem. Appellant's opening brief names 3M as appellee and 3M was served with all notices and briefs for the appeal. Appellant explains its exclusive focus on Raychem on the basis that Raychem briefed and argued the economic loss rule in the district court without any assistance from 3M. 3M participated in the summary judgment only by stipulating that it would be bound by the outcome of Raychem's motion on this issue.

Appellant's explanation of its focus in the brief is of no matter. Because 3M suffered no prejudice, there is no waiver or abandonment of the claims against 3M. *See Lynn v. Sheet Metal Workers' Int'l. Ass'n*, 804 F.2d 1472, 1482 (9th Cir.1986); *Meehan v. County of Los Angeles*, 856 F.2d 102, 105 (9th Cir.1988). The only issue in this appeal is the application of the economic loss rule. The legal and factual issues involved in the application of the economic loss rule are identical for both Raychem and 3M. Appellant's opening brief provided 3M with notice of the arguments supporting reversal of the summary judgment and 3M had the opportunity to fully brief these issues in its response.

3M was named as an appellee, was served with all briefing, was on notice of all issues on appeal and had the opportunity to fully respond to all of appellant's points of appeal. Because 3M had full notice and was not prejudiced, appellant's focus on Raychem in its opening brief does not result in waiver or abandonment of the claims against 3M. *See Lynn*, 804 F.2d at 1482.

We reverse the judgment of the district court and remand the case for further proceedings.

REVERSED AND REMANDED