**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHMM, LLC,<br>    *Plaintiff-Appellant*,<br><br>v.<br><br>FREEMAN MARINE EQUIPMENT,<br>INC.,<br>    *Defendant-Appellee*. | No. 13-35163<br><br>D.C. No.<br>3:12-cv-01484-ST<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
October 8, 2014—Portland, Oregon

Filed June 29, 2015

Before: Alex Kozinski, Raymond C. Fisher
and Andre M. Davis,[*] Circuit Judges.

Opinion by Judge Kozinski

---

[*] The Honorable Andre M. Davis, Senior Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

## SUMMARY[**]

### Admiralty Law

Reversing the district court's judgment in an admiralty case, the panel held that a vessel owner could sue for the physical damage a defective vessel component caused to property that the owner added to the vessel before the vessel was delivered.

The panel held that the vessel owner's tort claims were not barred by the economic loss doctrine, which precludes recovery against a manufacturer for physical damage that the manufacturer's defective product causes to the "product itself," but allows recovery for physical damage the product causes to "other property."

### COUNSEL

Brian P.R. Eisenhower, Anthony J. Pruzinsky (argued), Hill Rivkins LLP, New York, New York; David R. Boyajian, Colin J. Folawn, Daniel F. Knox, Schwabe, Williamson & Wyatt, Portland, Oregon, for Plaintiff-Appellant.

Jay W. Beattie (argued), James P. McCurdy, Lindsay, Hart, Neil & Weigler, Portland, Oregon; David W. Lannetti, Edward J. Powers, Vandeventer Black LLP, Norfolk, Virginia, for Defendant-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

KOZINSKI, Circuit Judge:

The economic loss doctrine precludes recovery against a manufacturer for physical damage that the manufacturer's defective product causes to the "product itself." *E. River S.S. Corp.* v. *Transamerica Delaval Inc.*, 476 U.S. 858, 866–71 (1986). But the manufacturer can be sued for physical damage the product causes to "other property." *Id.* at 867–68. We consider whether a vessel owner may sue for the physical damage a defective vessel component causes to property that the owner adds to the vessel before the vessel is delivered. Put another way, is property added by the owner to a vessel prior to the delivery of the vessel considered "other property"?

## I.  Background

CHMM, LLC is the owner of M/Y JAMAICA BAY, a 59.5-meter luxury yacht. In 2006, CHMM contracted with Nobiskrug GmbH to "construct, equip, launch and complete [the yacht] at [Nobiskrug's] shipyard and to sell and deliver [the yacht] to [CHMM]" for approximately €34.2 million. Nobiskrug subcontracted with Freeman Marine Equipment for the manufacture of a "weathertight" door for installation in the yacht. This door provided access from the foredeck to the interior of the yacht.

The shipbuilding contract between Nobiskrug and CHMM states that "the Interior Outfit of the Yacht is to be provided by [CHMM]" and that "delivery and installation of the Interior Outfit has to be executed within the time frame laid down in [Nobiskrug's] Construction Schedule." CHMM

contracted with third parties for the purchase and installation of the items in the yacht's interior. The yacht that Nobiskrug ultimately delivered to CHMM contained a finished interior outfit.

In 2011, while the yacht was at sea en route to the Bahamas, the Freeman door allegedly malfunctioned, letting in a substantial amount of water. The subsequent flooding severely damaged the yacht and its interior, including woodwork, furniture, carpeting, electrical wiring, and electronics. CHMM estimates it would cost over $18 million to repair the damage.

CHMM sued Freeman, alleging five tort claims— negligence, defect in design, defect in manufacture, failure to properly instruct in the installation and use of the door and negligent misrepresentation. Freeman moved to dismiss on the ground that recovery for physical damage to the yacht's interior was barred by the economic loss doctrine announced in *East River Steamship*. While this motion was pending, CHMM amended its complaint to add a sixth claim for breach of "contract, quasi-contract and/or warranty."

The magistrate judge construed the motion as against the amended complaint and determined that the economic loss doctrine barred CHMM's five tort claims because the interior of the vessel was "integrated into" the completed vessel and was therefore part of the product itself. The magistrate judge held that the portion of the sixth count that alleged breach of contract should be dismissed because CHMM had no contractual relationship with Freeman. But the magistrate judge concluded that it would be premature to dismiss the breach of quasi-contract or express warranty claims without giving CHMM an opportunity for discovery. The district

court adopted the magistrate judge's Findings and Recommendation in full and granted CHMM leave to file a second amended complaint "to the extent that [CHMM] seeks tort remedies for damage to 'other property' added after delivery of the Vessel by Nobiskrug to [CHMM]."

CHMM now appeals the district court's interlocutory order dismissing the five tort claims as barred by the economic loss doctrine. We have jurisdiction under 28 U.S.C. § 1292(a)(3), which allows us to hear appeals from "[i]nterlocutory decrees of . . . district courts . . . determining the rights and liabilities of the parties to admiralty cases." 28 U.S.C. § 1292(a)(3); *see All Alaskan Seafoods, Inc.* v. *M/V Sea Producer*, 882 F.2d 425, 427 (9th Cir. 1989) ("To fall within the ambit of section 1292(a)(3), it is sufficient if a[] [district court] order conclusively determines the merits of a particular claim as between the parties."); *see also Sea Lane Bahamas Ltd.* v. *Europa Cruises Corp.*, 188 F.3d 1317, 1321 (11th Cir. 1999) ("As a general rule, a district court's order resolving one or more claims on the merits is appealable under § 1292(a)(3), irrespective of any claims that remain pending."). We review de novo, accepting all facts alleged in the amended complaint as true and construing them in the light most favorable to CHMM. *Barker* v. *Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009).

## II. Discussion

We have described the economic loss doctrine, as applied in products liability cases, as follows:

> If a plaintiff is in a contractual relationship with the manufacturer of a product, the plaintiff can sue in contract for the normal

panoply of contract damages, including foreseeable lost profits and other economic losses. Whether or not the plaintiff is in a contractual relationship with the manufacturer, the plaintiff can sue the manufacturer in tort only for damages resulting from physical injury to persons or to property *other than the product itself*.

*Giles* v. *Gen. Motors Acceptance Corp.*, 494 F.3d 865, 874 (9th Cir. 2007) (emphasis added). This doctrine is rooted in "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss." *Seely* v. *White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965) (en banc). As Chief Justice Traynor explained in *Seely*, this distinction rests on the understanding that a manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm," but he "cannot be held [liable] for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Id.*

The Supreme Court relied on *Seely* in applying the economic loss doctrine to products liability cases in *East River*. 476 U.S. at 871. There, supertanker charterers sought recovery in tort for damage caused by defective turbine parts. The Court held that the charterers were precluded from tort recovery because "there was no damage to 'other' property," as "each supertanker's defectively designed turbine components damaged only the turbine itself." *Id.* at 867. The Court reasoned:

> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." The maintenance of product value and quality is precisely the purpose of express and implied warranties. Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.

*Id.* at 872 (citations and footnote omitted).

The Court added that a contract or warranty action has a "built-in limitation on liability" in the form of the "agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach." *Id.* at 874. By contrast, permitting tort recovery for "all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums," as products liability law imposes "a duty to the public generally." *Id.* Indeed, it's "difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." *Id.* Thus, the Court observed, the economic loss doctrine "account[s] for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." *Id.* at 870–71.

A decade later, the Court revisited this "corner of tort law" in *Saratoga Fishing Co.* v. *J.M. Martinac & Co.*, 520 U.S. 875, 877 (1997). Martinac built a fishing vessel in

which it installed a hydraulic system designed by Marco Seattle Inc. Joseph Madruga purchased the vessel and added equipment—a skiff, fishing net and spare parts. Madruga then sold the vessel, which contained the additional equipment, to Saratoga Fishing Company. The vessel later caught fire and sank as a result of a defective hydraulic system, after which Saratoga Fishing filed a tort suit against Martinac and Marco Seattle.

There was no dispute that the "product itself" consisted "*at least* of a ship as built and outfitted by its original manufacturer and sold to an initial user." *Id.* at 877. The question was whether Saratoga Fishing, the subsequent user, could recover in tort for "the physical destruction of *extra equipment . . . added* by the initial user after the first sale and then resold as part of the ship when the ship itself is later resold to a subsequent user." *Id.* The Court held that the equipment added by Madruga was "other property" and, as such, Saratoga Fishing was eligible to recover in tort for damage to that equipment. "When a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself' under *East River*. Items added to the product by the Initial User are therefore 'other property,' and the Initial User's sale of the product to a Subsequent User does not change these characterizations." *Id.* at 879.

Freeman argues that *Saratoga Fishing* established a "bright-line rule stating that the product is defined at the time it enters the stream of commerce, and that any items added after that time constitute 'other property' for purposes of the economic loss doctrine." Freeman views as dispositive that the yacht wasn't "placed into the stream of commerce, *i.e.*, was not delivered to CHMM, until the [yacht] was fully

complete." Its position is that the damaged property in the interior of the yacht consists of the "product itself," for which tort recovery is unavailable, because CHMM added that property *before* Nobiskrug delivered the completed yacht from the shipyard.

A closer look at *Saratoga Fishing* reveals that it draws no bright-line rule based on the time of delivery. Rather, in determining whether items added to a product can be considered "other property," the Court focused on who added those items to the product—the user or the manufacturer of the product.

*Saratoga Fishing* observed that "[s]tate law often distinguishes between items added [by a user] to or used in conjunction with a defective item purchased from a Manufacturer (or its distributors) and (following *East River*) permits recovery for the former when physically harmed by a dangerously defective product." 520 U.S. at 880 (citing, for example, *A.J. Decoster Co.* v. *Westinghouse Electric Corp.*, 634 A.2d 1330 (Md. 1994) (chicken farm owner could recover in tort for the death of his chickens caused by a defective chicken house ventilation system)). The Court also cited another admiralty case, *Nicor Supply Ships Associates* v. *General Motors Corp.*, 876 F.2d 501 (5th Cir. 1989), which held that a ship charterer who added seismic equipment to the ship may recover in tort for damage to that equipment caused by a defective engine. The Court concluded that it would maintain the distinction the case law suggests "between the components added to a product by a manufacturer before the product's sale to a user" and "those items added by a user to the manufactured product." *Saratoga Fishing*, 520 U.S. at 884.

*Saratoga Fishing* does not turn on the *timing* of the addition to the product. What matters for purposes of tort recovery is that the items were added by the user. This is because there is a fundamental difference between the situation where "a defective manufactured product causes [damage] to property added by the Initial User" and the situation in *East River*, where "a defective component causes [damage to] the manufactured product, other than the component itself." *Id.* at 883. As the Court explained in *Saratoga Fishing*, the latter situation is well-suited for a warranty action, while the former is not:

> Initial users, when they buy, typically depend upon, and likely seek warranties that depend upon, a manufacturer's primary business skill, namely, the assembly of workable product components into a marketable whole. Moreover, manufacturers and component suppliers can allocate through contract potential liability for a manufactured product that does not work, thereby ensuring that component suppliers have appropriate incentives to prevent component defects that might destroy the product. There is no reason to think that initial users systematically control the manufactured product's quality or . . . systematically allocate responsibility for user-added equipment [] in similar ways.

*Id.* at 883–84 (citations omitted). This reasoning holds true regardless of whether the user added items "after the initial sale," as in *Saratoga Fishing*, *id.* at 884, or, as here, prior to it. In both instances, the manufacturer of the product to

which the user added items had no responsibility for manufacturing or assembling the user-added items.

"Manufacturers of integrated products can avail themselves of warranty provisions and can spread the risk of product defect over their entire market." *All Alaskan Seafoods, Inc.* v. *Raychem Corp.*, 197 F.3d 992, 995 (9th Cir. 1999). For example, "[w]hen purchasing component parts, [they] can exercise market power to negotiate price and allocation of downstream risks of defective components." *Id.* They can also "impose specifications on component suppliers." *Id.* And they can "use the same components in multiple iterations of the same product" in order to achieve economies of scale. *Id.* But a manufacturer who lacks responsibility for the manufacture or assembly of user-added items isn't in a position to work with component suppliers of user-added items in such ways. Warranty law is thus ill-suited to protect against a malfunctioning product that causes physical damage to user-added items.

Freeman argues that "[t]he initial purchaser of a vessel has the opportunity to negotiate warranties with the various vessel builders with which it contracts—before vessel delivery into the stream of commerce—whereas such warranties typically are unavailable from those builders for equipment added after delivery." But the Supreme Court rejected this very argument in *Saratoga Fishing*. In discussing whether the initial user should have been expected to offer a warranty to the subsequent purchaser for the items the initial user added to the vessel, the Court stated:

> Of course, nothing prevents a user/reseller from offering a warranty. But neither does anything prevent a Manufacturer and an Initial

> User from apportioning through their contract potential loss of any other items—say, added equipment or totally separate physical property—that a defective manufactured product, say, an exploding engine, might cause. *No court has thought that the mere possibility of such a contract term precluded tort recovery for damage to an Initial User's other property.*

520 U.S. at 882 (emphasis added).

None of the cases Freeman cites in support of its proposed bright-line rule are on point. *See, e.g.*, *All Alaskan Seafoods, Inc.*, 197 F.3d at 993–95 (the act of resale does not preclude the subsequent user from tort recovery); *Sea-Land Serv., Inc.* v. *Gen. Elec. Co.*, 134 F.3d 149, 154–55 (3d Cir. 1998) (a defective replacement component by the same manufacturer is part of the product itself); *Petroleum Helicopters, Inc.* v. *Avco Corp.*, 930 F.2d 389, 393 (5th Cir. 1991) (a defective interchangeable component by the same manufacturer is part of the product itself); *Shipco 2295, Inc.* v. *Avondale Shipyards, Inc.*, 825 F.2d 925, 929 (5th Cir. 1987) (manufacturer assembled the entire vessel, and thus the product was the completed vessel); *Exxon Shipping Co.* v. *Pac. Res., Inc.*, 835 F. Supp. 1195, 1201 (D. Haw. 1993) (a defective interchangeable component purchased directly from the manufacturer is part of the product itself). Freeman claims that these cases show that courts "evaluated the object of the parties' bargain, which was the acquisition of a fully-functioning product." However, in *All Alaskan Seafoods*, we interpreted *Saratoga Fishing* as having "rejected the view . . . that would define the 'product' . . . as the object of the purchaser's bargain." 197 F.3d at 994. In so doing, we

emphasized "the distinction between components incorporated by a manufacturer before sale to an initial user and those items added by a user of the manufactured product." *Id.*

The rule of *Saratoga Fishing* can thus be distilled as follows: Where the manufacturer of a product had no responsibility for manufacturing or assembling items that the user adds to the product, the user-added items are considered "other property" for purposes of the economic loss doctrine.

In applying this rule to our case, we begin by examining Section 2.10 of the Shipbuilding Contract, entitled "Interior Outfit," which sets forth the respective responsibilities of CHMM ("the Purchaser" and user) and Nobiskrug ("the Builder" and manufacturer):

> (a) The Interior Outfit of the Yacht is to be provided by the Purchaser. The Builder does not assume any responsibility or liability with regard to the Interior Outfit, except as provided herein. The interface between the scope of work of the Builder and the Interior Outfit is described in the Interior Outfitting Demarcation List.

> (b) The Purchaser will supply and install the Interior Outfit by using materials and methods which are consistent with the requirements and Specifications related to specified noise and vibration standards as pre-approved by the Builder, the Classification Society and the Flag State and in compliance with the weight limits for the Interior Outfit as stipulated in

the Weight Limits List attached as Schedule 11. The delivery and installation of the Interior Outfit has to be executed within the time frame laid down in the Builders' Construction Schedule and in the Action List by the contractor(s) chosen and employed by the Purchaser who will not interfere with the Builders' scope of work. Any delay in delivering and installing of the Interior Outfit shall be a Permissible Delay.

(c) The Purchaser shall furnish the Builder with all documentation related to the Interior Outfit which is needed for Classification of the Yacht.

The "Interior Outfitting Demarcation List" specifies that Nobiskrug's scope of work is the "bare ship," while CHMM's is the Interior Outfit. To further clarify matters, the Contract defines "Interior Outfit" as "the Interior Outfit of the Yacht for which [CHMM] is responsible."

In Section 2.10, Nobiskrug disclaims "any responsibility or liability with regard to the Interior Outfit," with the exception of pre-approving the noise and vibration standards that CHMM used for the Interior Outfit and obtaining Classification certificates for the yacht once it received the relevant documentation from CHMM. CHMM, on the other hand, is responsible for "supply[ing] and install[ing] the Interior Outfit by using materials and methods which are consistent" with certain industry specifications; completing delivery and installation of the Interior Outfit "within the time frame laid down in [Nobiskrug's] Construction Schedule"; ensuring that the contractors CHMM hired to work on the

Interior Outfit don't "interfere with [Nobiskrug's] scope of work"; and providing Nobiskrug with "all documentation related to the Interior Outfit which is needed for Classification of the Yacht."

The relevant facts can be boiled down to the following: (1) Nobiskrug was responsible for manufacturing the bare ship; (2) CHMM, the user, added items to the bare ship; and (3) Nobiskrug wasn't responsible for manufacturing or assembling these user-added items. Under *Saratoga Fishing*, the items in the Interior Outfit consist of "other property," while the bare ship consists of the "product itself."

As discussed above, this is not a case within the wheelhouse of warranty law. CHMM and Nobiskrug didn't work together to manufacture or assemble the Interior Outfit *and* the bare ship. Rather, CHMM assumed sole responsibility for providing and installing items in the Interior Outfit, and Nobiskrug assumed sole responsibility for manufacturing the bare ship. It's unreasonable to expect CHMM to depend upon a warranty from Nobiskrug that the bare ship would not damage any items in the Interior Outfit. And it should come as no surprise that Nobiskrug did not offer such a warranty; the shipbuilding contract states that the warranties provided therein "apply only to the work of [Nobiskrug], [Nobiskrug's] employees, and of its sub-contractors and suppliers."

It makes no difference that CHMM added the items comprising the Interior Outfit prior to the delivery of the yacht from Nobiskrug's shipyard. CHMM agreed in the Shipbuilding Contract to complete the Interior Outfit by the time Nobiskrug finished construction of the bare ship. Perhaps this arrangement was made to speed up the process

so CHMM didn't have to wait until the bare ship was ready to then outfit the interior and receive the necessary registration and Classification certificates. Whatever the parties' motivations, CHMM shouldn't be penalized for not waiting until after the delivery of the bare ship to outfit the interior.

Nobiskrug subcontracted with Freeman to provide the door connecting the foredeck to the interior of the yacht, and there is no dispute that this door is part of the product. CHMM's claim is that the product (the bare yacht, which included the Freeman door) caused physical damage to other property (the Interior Outfit). The economic loss doctrine does not bar CHMM from suing in tort for damage to the Interior Outfit caused by the allegedly defective Freeman door.

**REVERSED and REMANDED.**