**Mac T. WILLIAMS**

v.

**HOLLYWOOD MARINE, et al.**

Civ. A. No. 87–3734.

United States District Court,
E.D. Louisiana.

July 13, 1989.

Darleen M. Jacobs, Trial Atty., Warren S. Edelman, New Orleans, La., Sanford Steckler, Biloxi, Miss., for plaintiff.

Hebert, Mouledoux & Bland, Scott Jones, Wilton E. Bland, III, Maurice Hebert, New Orleans, La., for Callais & Sons Inc., Certain Underwriters, Hollywood Marine, Inc.

Jones, Walker, Waechter, Poitevant, Carrere & Denegre, Glenn G. Goodier, Trial Atty., New Orleans, La., for Belcher Oil Co.

Johnston, Hume & Johnston, Christopher G. Hume, III, Trial Atty., Mobile, Ala., Hoffman, Sutterfield, Ensenat & Bankston, Gregg L. Spyridon, Trial Atty., New Orleans, La., for Petroleum Service Corp.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court for nonjury trial. Having considered the evidence, the parties' memoranda and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

### The Facts

On November 17, 1986, plaintiff Mac T. Williams, a Louisiana resident, was employed by Callais & Sons, Inc. (Callais) as a seaman and a tankerman, in which capacity he had been so employed by Callais for approximately 12 years. Callais is the owner of the M/V JOHNNY JAMES, a typical river pushboat, of which Williams was a crew member. Hollywood Marine, Inc. (Hollywood), a Texas corporation, is the owner of two dumb barges which were laden with heavy oils in the tow of the M/V JOHNNY JAMES on the night of the accident pursuant to a towage agreement between Hollywood and Callais.[1] Defendant Belcher Oil Company, Inc. (Belcher), a Florida corporation, is the owner of a dock facility at Blakely Island on the Mobile River at Mobile, Alabama. Belcher's dock consists of a north section and a south section, both capable of loading, unloading

and steaming barges. Belcher contracted with defendant Petroleum Service Corporation (PSC), a Louisiana corporation, to provide qualified tankermen properly trained by Belcher and PSC to operate Belcher's dock and equipment on an as-needed basis. On November 15, 1986, at about 0200, the M/V JOHNNY JAMES and its tow of the two Hollywood barges arrived at the Belcher dock and were moored at the south end. The two barges were to be steamed at this dock, and then moved upriver to a refinery to be unloaded.[2]

In performing steaming operations at the Belcher dock, once the barges are moored, a steam hose located on a motorized reel on the dock is unreeled and connected to the appropriate header on the barge. The equipment which actually creates the steam is located in a tank farm behind the dock facility. The steam hose itself is two inches in diameter, and is equipped with a flanged screw coupling on the end which is attached and disconnected by means of a hammer or wrench.[3] After it is determined that the cargo has been heated to the proper temperature, the steam is shut off and the hoses are disconnected and allowed to lie on deck for a time to cool and to drain. Thereafter, the hoses are reeled back onto the dock. The hose reels at the Belcher dock are powered by an electric motor, and are operated by depressing and holding down a switch located on a stand beside the reel.[4] The uncontroverted testimony indicated that the vessel crews are responsible for connecting and disconnecting the hoses, while the dock personnel are responsible for feeding out the hoses and for reeling them in.

Plaintiff testified that on November 17, 1986, at about 3:00 a.m., he was awakened by the tug captain, Johnny Callais, who told him the barges had reached the proper temperature for discharge and were to be moved upriver to another facility for this

1. Hollywood Marine was dismissed by stipulation at the beginning of trial.

2. In cold weather, the cargo of oil in the barges becomes too viscous to be pumped out. Steaming is a process whereby steam is pumped through the barges to heat up the oil, thereby

thinning the viscosity and allowing the cargo to be discharged.

3. *See* Plaintiff's Exhibit 6 *in globo; see* also Belcher Exhibits 11–15.

4. *See id.*

purpose. Callais ordered plaintiff, who was a deckhand at the time, to go out on the barges and disconnect the steam hoses and generally prepare the barges for departure.[5]

Plaintiff further testified that he disconnected the hose in question and laid it on the deck, whereupon the dockman started reeling the hose in; that as he turned to continue his duties, he heard someone call out that the hose was hung up;[6] that he went back to the hose and picked it up, about two inches from the end, and started walking the hose across the barge; he carried the hose coupling nozzle about waist high in his left hand. During this procedure, plaintiff admitted the nozzle was facing at least somewhat towards his body. The evidence shows that the dockman was reeling in the hose at the same time plaintiff was walking towards the edge of the barge. Plaintiff further testified that as he neared the edge of the barge, hot water and steam came gushing out of the end of the hose and onto his groin and upper thigh area. He stated that no water had come out of the hose before this time, and that he could not see the dockman at the time of the accident, as plaintiff was right at the edge of the barge, and the level of the dock was about ten to twelve feet above the level of the deck of the barge. Immediately following the accident, with his clothes steaming and wet, plaintiff reported the incident to Captain Callais, who he said told plaintiff to go change his clothes. Plaintiff did so, and then climbed a ladder up onto the dock and took a taxi to the hospital.

The Court takes cognizance of the following additional testimony of plaintiff: he had worked on boats and barges most of his life in the capacity of a captain as well as a deckhand; he had much experience in steaming operations, including the handling of the steam hoses; he had worked at 25–30 docks similar to the Belcher facility, and had even been to the Belcher facility two or three times before; however, he stated he was unfamiliar with the motorized steam hose reel at the Belcher facility, and had never seen such an apparatus before.[7] When confronted with his deposition, plaintiff admitted to having stated therein that he had been to the Belcher dock more than ten times; had been involved in steaming operations there less than ten but more than five times; further, not only that he was aware that the Belcher facility had motorized hose reels, but he had also seen them operated; and finally, that motorized hose reels were not uncommon at the time of plaintiff's accident in November of 1986.

Furthermore, plaintiff denies remembering that immediately after the accident he told Captain Callais he was carrying the hose with the nozzle end pointed towards himself, although the testimony of Callais and the accident report Callais prepared on the day of the accident, as well as the nature of the accident itself, all directly support this conclusion.[8] Plaintiff admitted that carrying a steam hose with the nozzle pointing towards his body would be dangerous, and that he could have held the hose three to four feet from the end and carried it to the edge of the barge and left it there.[9]

5. The steam had been turned off by this time.

6. The flanged nozzle of the hose apparently had become hooked on an appurtenance of the barge.

7. Plaintiff testified he had only had experience with handoperated hose reels.

8. See Belcher Exhibit 1, accident report dated November 17, 1986. Johnny Callais, Jr., the captain of the M/V JOHNNY JAMES at the time of the accident, testified that plaintiff told him he (plaintiff) had disconnected the hose, had picked it up and was walking with it when the hot water and steam splashed out. He further stated that plaintiff expressly admitted the hose was pointed towards himself when the accident occurred.

9. David Leonard, the relief captain of the M/V JOHNNY JAMES at the time of the accident, testified he was on the deck of the opposite barge when he saw the hose become hung up. Leonard testified he saw plaintiff pick up the hose, but that he could not see the manner in which plaintiff carried it, as plaintiff's back was to the witness. He further testified he did not see the actual accident because plaintiff had moved behind a piece of equipment on the barge deck, which blocked Leonard's line of sight.

Thomas Ladnier was the PSC employee who was operating the motorized hose reel at the time of the accident.[10] He had been a licensed tankerman for three and one-half years, was trained in dock operations by PSC and Belcher personnel at the Belcher facility, and was familiar with the equipment at the facility. Pursuant to the agreement between Belcher and PSC, Ladnier was provided by PSC as dock operator the night of the accident.[11] Ladnier stated he was instructed by a Belcher employee, Bill Pratt, to ask the Callais boat crew to disconnect the steam hoses and move the barges to make room for another tow.[12] He testified that after the hose was disconnected, he began to reel it in; he was facing the barge as he began to reel; there was approximately forty feet of hose between the reel and the fitting on the barge; he reeled in about ten feet before the hose hung up on the barge; he called or whistled to plaintiff and pointed to the hose; after plaintiff had freed the hose, he motioned by hand to plaintiff with what he called an "okay signal," and turned back to the drum and started reeling again;[13] when he looked back again as he was reeling, he could not see the plaintiff, but almost immediately thereafter, he heard plaintiff call out; he did not see plaintiff because the placement of the motorized drum approximately four feet from the edge of the dock, combined with the fact that the barge deck was ten to twelve feet below the dock, hid plaintiff from his line of sight.[14]

The Court concludes that the accident occurred in the following fashion. When plaintiff picked up the hose and walked towards the edge of the barge holding it waist high, he created a sag or belly in the hose which allowed any remaining hot water to be trapped within the hose. As Ladnier continued to reel, this trapped water was naturally forced out of the end of the hose as the remainder of the hose was lifted off the deck towards the level of the dock ten to twelve feet above.

It is undisputed that the steam hose involved was not equipped with a cap on the end.[15] Plaintiff testified that he has seen steam hoses with plugs which could be screwed into the end of the coupling when the hose is not in use. The testimony is uncontroverted, however, that the vast majority of steam hoses do not have such caps. Plaintiff admitted he knows hot water remains in the hoses after steaming operations are finished, and that this is a common and expected occurrence at any dock at which steaming operations are conducted. Plaintiff further stated he voluntarily picked up the hose, because he was the closest man to it, and whether he picked up the hose and how he held it were his decisions alone.[16]

For the purposes of this opinion, plaintiff's injuries may be summarized as follows.[17] Dr. Arnold Luterman was plaintiff's treating physician upon his entry and subsequent stay at the University of South Alabama Medical Center. Dr. Luterman testified that plaintiff suffered second degree burns to the front aspect of both of his thighs, predominantly the right thigh, and to his genital area, involving a total

10. Ladnier testified by deposition. See Plaintiff's Exhibit 9.

11. See Belcher Exhibit 7, agreement dated October 8, 1986.

12. The evidence shows the only Belcher employee at the dock facility the night of the accident was Bill Pratt, who was not actually present at the scene of the accident, but was at another area of the facility at that time.

13. It appears he was attempting to communicate to plaintiff that freeing the hose was sufficient. See Plaintiff's Exhibit 9, Deposition of Tom Ladnier, at p. 33, lns. 15–18; p. 63, lns. 12–15.

14. *Id.* at p. 35, lns. 4–10.

15. See Plaintiff's Exhibit 6 *in globo;* Belcher Exhibits 11–15.

16. The testimony was uncontroverted that plaintiff's decision to pick up the hose was his own, and no one asked or instructed him to do so.

17. For a full account of plaintiff's injuries suffered as a result of this incident and treatment thereof, see Plaintiff's Exhibit 10 *in globo,* Deposition of Dr. Arnold Luterman.

body surface area of approximately eight percent;[18] that second degree burns are very painful, in that the nerve endings beneath the skin have been exposed by the skin's loss of its various protective functions to the body due to the burn.[19] The doctor further testified plaintiff's burns required daily debridement; plaintiff also required *inter alia* nursing care, pain management and physical therapy.[20] Plaintiff's stay in the hospital lasted fourteen days.[21]

Subsequent to plaintiff's discharge from the hospital December 1, 1986, Dr. Luterman continued caring for plaintiff on an outpatient basis.[22] Plaintiff told the doctor on his January 15, 1987 check-up that he was ready to return to work.[23] Plaintiff was cleared for full duty February 19, 1987.[24] Dr. Luterman's final prognosis for plaintiff predicted an excellent recovery.[25]

Dr. Rodney Appel, a urologist, testified that he found no evidence of urologic disability upon examination of the plaintiff; and that plaintiff specifically denied any decrease in sensitivity or decrease in libido.[26] Dr. John Church, a plastic surgeon, testified that a physical examination of plaintiff revealed very mild, patchy, hyp- and hyperpigmentation in the areas of the burn on the anterior thigh and lower legs.[27]

He further testified that, "It takes a careful observation to discern any evidence of the burn at all at this time."[28] Dr. Church summarized plaintiff's condition thusly: "There is no loss of function or limitation with reference to his job, and he is back at full duty following this injury. He is on no medications for the injury at this time. I see no permanent disability as a result of this accident. I see no scarring as a result of this accident. The mild skin color change he has will be less apparent with time and requires no treatment. The itching problem he has will slowly subside with time and requires no treatment. From a Plastic Surgeon's point of view, I can foresee no medical or surgical treatment in his future as the result of this injury."[29] The Court concurs in all respects with all of the foregoing medical findings.

### The Law

This Court has jurisdiction over the subject matter of this case by virtue of the Court's admiralty and marine jurisdiction.[30] Plaintiff was injured during the course and scope of his employment aboard the Hollywood barge, a vessel in navigation, while in furtherance of a traditional maritime activity, namely, cargo operations on a vessel in navigation.[31] With admiralty jurisdiction

---

18. *Id.* at p. 12, lns. 10–22; p. 13, lns. 3–5; p. 47, ln. 11–p. 48, ln. 3.

19. *Id,* at p. 13, ln. 15–p. 14, ln. 19; p. 15, ln. 17–p. 16, ln. 1.

20. *Id.,* at p. 17, ln. 1–p. 18, ln. 20.

21. *Id.,* at p. 22, lns. 1–3.

22. *Id.,* at p. 33, lns. 18–22.

23. *Id.,* at p. 32, ln. 14–p. 33, ln. 4.

24. *Id.,* at p. 37, lns. 6–10.

25. *Id.,* at p. 70, lns. 9–18.

26. See Appel Exhibit 1, report of Dr. Rodney A. Appel dated September 21, 1988, admitted into evidence in lieu of testimony on direct.

27. See Church Exhibit 1, report of Dr. John M. Church, Jr., dated November 2, 1988, admitted into evidence in lieu of testimony on direct.

28. *Id.,* at p. 2.

29. *Id.,* at pp. 2–3; see also Belcher Exhibit 18, pictures of plaintiff's injuries taken in February 1988.

30. 28 U.S.C. § 1333; *see also Richendollar v. Diamond M Drilling Co., Inc.,* 819 F.2d 124, 127 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); *Christoff v. Bergeron Industries, Inc.,* 748 F.2d 297, 298 (5th Cir.1984); *Parker v. South Louisiana Contractors, Inc.,* 537 F.2d 113, 115 (5th Cir.1976). Since plaintiff is undisputedly a seaman, and as he has already settled with his employer, Callais & Sons, Inc., there is no basis for a claim under the Jones Act, 46 U.S.C.App. § 688. See Order & Reasons dated May 23, 1989, Rec. doc. 115. Further, since plaintiff is a seaman, he cannot be a longshoreman, thus the Court finds no basis for a claim under the LHWCA, 33 U.S.C. § 901 *et seq. See Thibodeaux v. Torch, Inc.,* 858 F.2d 1048, 1050 (5th Cir.1988).

31. *See Kamani v. Port Houston Authority,* 702 F.2d 612, 613 (5th Cir.1983), (citing *Kelly v. Smith,* 485 F.2d 520, 526 (5th Cir.1973)), *cert. denied sub nom. Chicot Land Co. v. Kelly,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

comes the application of substantive admiralty law.[32] Absent a relevant statute, the general maritime law, as developed by the judiciary, applies.[33]

■ The Court finds plaintiff's sole remaining claims are those for negligence against Belcher and PSC under general maritime law. The analysis of a maritime tort is guided by general principles of negligence.[34] Under those principles, a party is accountable only to those to whom a duty is owed. *Id.,* 833 F.2d at 67, (citing *Watz v. Zapata Offshore Co.,* 431 F.2d 100 (5th Cir.1970)). It is the duty of the Court to determine the parameters of a tortfeasor's duty.[35] That determination involves a number of different factors, including most notably the foreseeability of the harm suffered by the complaining party.[36] A harm is "the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."[37]

■ Pursuant to these basic principles, the Court finds PSC's employee Tom Ladnier negligent in the operation of the motorized hose reel at the time of the accident in question. Ladnier was a licensed tankerman and familiar with the equipment at the Belcher dock facility; he had been trained there.[38] He was well aware that hot water remained in the hoses for some time after being disconnected, and familiar with the proper method for carrying a recently disconnected steam hose.[39] He observed plaintiff pick up the hose and hold it about waist high, before turning his back to the barge to continue reeling.[40] He further waited until he heard plaintiff call out before he turned to check on the hose's progress across the barge.[41]

The Court finds that a reasonable person, and especially an experienced tankerman such as Ladnier, could expect that as he stood on the dock and reeled the steam hose across the barge from a height of approximately ten to twelve feet above the barge, any steam condensate inside the hose would naturally and continually be spilling from the nozzle end, creating a potential hazard for anyone on the deck of the barge. There is no reason why Ladnier could not have allowed the hose to lie on the deck to cool down somewhat before reeling it in; he could have watched and waited until he saw plaintiff set the hose safely back on deck; or he could have warned plaintiff when he saw the latter holding the hose in a dangerous fashion. The evidence demonstrates that lighting and communication were no problem.[42] Furthermore, the evidence demonstrates, and Ladnier admits, that the hose reel may easily be operated in such a manner that the barge deck is in constant view.[43]

**32.** *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986).

**33.** *Id.* at 106 S.Ct. 2299, (citing *United States v. Reliable Transfer Co.,* 421 U.S. 397, 409, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975)).

**34.** *Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65, 67 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1987), (citing *Casaceli v. Martech Int'l., Inc.,* 774 F.2d 1322 (5th Cir.1985)).

**35.** *Id.,* 833 F.2d at 67, (citing Green, *Proximate Cause in Texas Negligence Law,* 28 Tex.L.Rev. 775 (1950)).

**36.** *Id.,* 833 F.2d at 67, (citing *Prosser and Keeton on Torts, Duty § 53 (5th ed.1984)). Duty has been defined as being measured by the scope of the risk that negligent conduct foreseeably en-*

tails. *Id.,* 833 F.2d at 67, (quoting Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases,* § 18.2 at 655 (2d ed.1986)).

**37.** *Id.,* 833 F.2d at 68.

**38.** Plaintiff's Exhibit 9 at p. 12, lns. 6–7; p. 13, lns. 11–14.

**39.** *Id.* at p. 32, lns. 5–15; p. 33, lns. 6–9; p. 38, lns. lns.-p. 39, ln. 4; p. 65, lns. 5–12.

**40.** *Id.,* at p. 36, lns. 12–15; p. 55, lns. 1–11.

**41.** *Id.,* at p. 54, ln. 16–p. 55, ln. 20.

**42.** *Id.,* at p. 44, lns. 15–20.

**43.** See Plaintiff's Exhibit 9, *Id.,* at p. 30, ln. 14–p. 31, ln. 9; see also Plaintiff's Exhibit 6 *in globo* and Belcher Exhibits 11–15. The switch is

█ The Court further finds plaintiff contributorily negligence in sustaining his injuries. Plaintiff is a tankerman of over fifteen years experience; at the time of the accident, he had served as both a captain and deckhand in his years of marine service; he had much experience in steaming operations, including the handling of steam hoses, and knew that residual hot water and steam in the hoses were a common and expected occurrence. The evidence is uncontroverted, and the Court also takes judicial cognizance of the fact that the proper way to carry such a hose, if at all, is to keep the business end as far away from the body as possible. In light of his experience plaintiff should have been well aware of this, and thus the Court finds plaintiff contributorily negligent in two respects. First, plaintiff carried the hose improperly, with the nozzle facing his groin area; second, plaintiff followed the hose all the way to the edge of the barge, clearly placing himself in a hazardous position should gravity assert itself, as it did in this case.

█ Although the Court finds no evidence that the equipment at the Belcher dock facility was not reasonably fit for its intended purpose,[44] the Court does find negligence on the part of Belcher in failing to properly train and/or supervise Ladnier. The evidence shows that Ladnier was trained by Belcher in conjunction with PSC.[45] Ladnier also testified that PSC personnel were required to work with a Belcher employee until the former were fully trained.[46] Ladnier had been working with PSC since approximately six weeks prior to the accident.[47] He testified that as a PSC employee, the only dock on which he worked was the Belcher dock;[48] and the night of the accident was the first time he was the dock man involved in reeling in the steam hose.[49]

█ Additionally, the evidence shows PSC was not an independent contractor as to Belcher at the time of the accident. Although the letter agreement between Belcher and PSC dated October 8, 1986 [50] does not address this point, testimony regarding the working relationship does. The uncontroverted evidence shows the agreement between Belcher and PSC was for the latter to provide personnel to *supplement* Belcher personnel at the Belcher dock facilities in Mobile and Pensacola (emphasis ours).[51] Pursuant to the agreement, PSC personnel only were supplied on an as-needed basis [52] and were paid by the hour.[53] The agreement, *supra*, specifies that the PSC personnel supplied pursuant thereto "are Coast Guard licensed tankermen ... qualified to serve as the dock operator (person in charge) at your terminals...." [54]

The duties of a "person in charge" of dock operations are outlined in the Coast Guard regulations. *See* 46 C.F.R. § 151.454 (1988). Such duties are limited to those relating to cargo transfers, and no mention is made therein of any duties not relating to such duties. In this regard, the uncontroverted testimony of Cordell Haymon, president of PSC,[55] demonstrates that the basic duties of PSC personnel follow

---

mounted so that the operator may stand behind the reel and view the hose as it is pulled across the deck of the barge. Ladnier was reeling in just such a fashion when he saw the hose fitting snag.

**44.** The Court notes that even if a cap or plug was provided, a person installing it would still be required to place himself at some degree of risk, as such installation would necessarily require positioning some part of the body in front of the nozzle.

**45.** Plaintiff's Exhibit 9, at p. 12, lns. 18–21.

**46.** *Id.,* at p. 13, lns. 3–4.

**47.** *Id.,* at p. 14, ln. 22–p. 15, ln. 1.

**48.** *Id.,* at p. 13, ln. 23–p. 14, ln. 1.

**49.** *Id.,* at p. 47, lns. 17–19.

**50.** Belcher Exhibit 7.

**51.** Plaintiff's Exhibit 11, Deposition of Thomas Chandler at p. 9, ln. 22–p.–p. 10, ln. 4; Plaintiff's Exhibit 16, Deposition of Cordell Haymon at p. 5, ln. 19–p. 6, ln. 2.

**52.** Plaintiff's Exhibit 16, *supra,* at p. 6, lns. 3–12.

**53.** *Id.,* at p. 11, ln. 1–2.

**54.** Belcher Exhibit 7, *supra,* at p. 1.

**55.** Plaintiff's Exhibit 16, *supra.*

those in the Coast Guard regulation cited *supra*, i.e., are restricted to tasks associated with cargo transfers.[56] Haymon testified, and the Court so finds, that there is no Coast Guard requirement that there be a dock operator standing by during steaming operations.[57] Haymon further testified that PSC personnel would go beyond these specified duties as instructed by Belcher personnel.[58] Ladnier himself testified that he would take instructions from Belcher personnel.[59]

Therefore, the Court finds Belcher negligent in failing to provide adequate training and/or supervision for Ladnier in the use of its dock facilities beyond those tasks for which he was qualified. The evidence shows Ladnier was inexperienced in dock operations, and in particular, this was his first steaming operation at Belcher's facility. Belcher exercised control over PSC personnel working at its dock, and the Court finds it could have supervised them as well. If Belcher desired PSC personnel to go beyond the job duties for which they were qualified, then Belcher had an obligation to see that they were properly trained and/or supervised to perform such tasks. Thus, Belcher breached its duty of reasonable care to plaintiff by (1) sending an inexperienced, unsupervised employee (2) to perform a task for which he was not fully qualified.

The Court finds as eminently foreseeable to both PSC and Belcher that the supplying of inadequately trained and/or improperly supervised dock operations personnel could result in injury to crews of the barges they serviced.

█ Further, the Court finds no negligence on the part of Hollywood Marine, and no unseaworthiness of Hollywood's barge. Not only was Hollywood stipulated

as dismissed at the beginning of trial, it is also uncontroverted that no employee of Hollywood was present at the time of plaintiff's accident; neither the dock nor the steaming equipment belonged to or was under the control of Hollywood; the men involved in the steaming operation were not controlled or supervised by Hollywood; and the Hollywood barge involved was of standard design with proper fittings and appurtenances required for the loading, transport and discharge of petroleum products, as approved by the U.S. Coast Guard.[60]

█ Finally, the Court finds no evidence of negligence on the part of Callais & Sons. As set out previously, plaintiff was a qualified and experienced tankerman who had been involved in many such steaming operations during his maritime tenure. Captain Callais merely instructed plaintiff to go out on deck and disconnect the hoses and generally prepare the barges for departure. The Court finds these types of duties fall within the ordinary course and scope of plaintiff's employment as a tankerman and deckhand on a tug with a tow. As set forth previously, there is no evidence of unusual weather conditions or any other condition which could make these tasks any other than purely mundane. There was no evidence of communication or lighting problems. Captain Callais was in the engine room of the M/V JOHNNY JAMES at the time of the accident, and the evidence is uncontroverted that all of plaintiff's activities regarding the hose after he disconnected it were totally voluntary.

█ Further, the Court finds plaintiff's employer Callais & Sons is entitled to recover the full amount of the maintenance and cure benefits it has paid on plaintiff's behalf[61] in proportion to the respective de-

**56.** *Id.,* at p. 7, ln. 7–p. 9, ln. 1; p. 25, lns. 14–17; p. 30, lns. 1–17.

**57.** See *id.,* at p. 9, lns. 11–15; p. 10, lns. 16–17; see also Plaintiff's Exhibit 11 at p. 42, lns. 4–9.

**58.** See Plaintiff's Exhibit 16, at p. 10, ln. 23–p.–p. 11, ln. 4; p. 26, lns. 10–24; p. 29, lns. 6–15.

**59.** See Plaintiff's Exhibit 9, at p. 20, lns. 1–6; p. 64, ln. 20–p. 65, ln. 1.

**60.** See Findings of Fact and Conclusions of Law on Behalf of Hollywood Marine, Inc., Rec. doc. 116.

**61.** See Callais Exhibit 1, Joint Stipulation, showing the total amount paid by Callais & Sons and its insurers in maintenance and cure benefits as $11,381.00.

**446**

gree of negligence attributable to PCS and Belcher. *Savoie v. Lafourche Boat Rentals, Inc.,* 627 F.2d 722, 723 (5th Cir.1980). Such recovery by Callais is not subject to reduction even though the Court finds plaintiff contributorily negligent.[62]

In sum, the Court finds both PSC and Belcher negligent in causing plaintiff's injuries herein; such negligence amounting to twenty-five percent on the part of each; plaintiff is found to have been contributorily negligent, such negligence amounting to fifty percent; the Court finds no negligence on the part of the remaining parties Hollywood and Callais & Sons. The Court finds the sum of SIXTY THOUSAND DOLLARS to be a just and reasonable compensation for plaintiff's injuries, not taking into account the percentage of plaintiff's contributory negligence.

Accordingly, for the foregoing reasons, the Clerk of Court is directed to enter final judgment in favor of plaintiff Mac T. Williams, and against defendants Petroleum Services Corporation and Belcher Oil Company jointly and in solido in the amount of THIRTY THOUSAND DOLLARS; and further to enter final judgment in favor of third party claimant Callais & Sons jointly and in solido against defendants Petroleum Services Corporation and Belcher Oil Company in the amount of ELEVEN THOUSAND THREE HUNDRED AND EIGHTY-ONE DOLLARS; and dismissing all other cross-claims, defendants Belcher and PSC to bear the costs of these proceedings.

---

**62.** *Id.,* 627 F.2d at 723; *Thibodeaux v. Texas Eastern Transmission Corp.,* 548 F.2d 581 (5th Cir.1977).