**FRUIT OF THE LOOM and Union Underwear Company, Inc. Plaintiffs,**

v.

**ARAWAK CARIBBEAN LINE LTD., Defendants.**

**Arawak Caribbean Line Ltd., Counter-plaintiff,**

v.

**Fruit of the Loom and Union Underwear Company, Inc., Counter–defendants.**

**Arawak Caribbean Line Ltd., Third–Party Plaintiff,**

v.

**Aetna Casualty and Surety Company, Third–Party Defendant.**

**No. 96–7013–CIV.**

United States District Court, S.D. Florida.

Oct. 23, 1998.

Kenneth Eric Cohen, Goldman & Hellman, Fort Lauderdale, FL, Robert Alexander Craven, McIntosh Sawran Peltz & Cartaya, Fort Lauderdale, FL, James W. Carbin, Donovan Parry Carbin McDermott & Radzik, New York, NY, for Fruit of the Loom.

Kenneth Eric Cohen, Goldman & Hellman, Fort Lauderdale, FL, James W. Carbin, Donovan Parry Carbin McDermott & Radzik, New York, NY, for Union Underwear Co., Inc.

Chad Steven Roberts, Green Cove Maritime Inc., Jacksonville, FL, for ARAWAK Caribbean Line, Ltd.

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DE# 60) AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DE# 68 & 70)

LYNCH, United States Magistrate Judge.

THIS CAUSE having come on to be heard upon the Motion for Summary Judgment [DE # 60] filed by Plaintiff, Fruit of the Loom ("FRUIT") and the Cross–Motions for Summary Judgment [DE # 68 & 70] filed by Defendants Arawak Caribbean Line Ltd. ("ARAWAK") and Seaside Trucking, Inc. ("SEASIDE"). This Court has reviewed the motions, the responses and having received arguments of counsel at a hearing held October 5, 1998 makes the following findings.

## BACKGROUND

ARAWAK is an ocean carrier and at the times relevant to this matter operated a ocean liner service between the Ports of Kingston, Jamaica and Port Everglades, Florida. SEASIDE is a domestic motor carrier.

FRUIT's Amended Complaint alleges that FRUIT tendered delivery of its cargoes to ARAWAK in Kingston, Jamaica, and that ARAWAK agreed to deliver FRUIT's cargoes to Jamestown, Kentucky. FRUIT's Amended Complaint further alleges that after the cargoes were carried by ARAWAK as far as Port Everglades, ARAWAK then sub-contracted the services of SEASIDE to complete the inland domestic portion of the motor carriage from Port Everglades, Florida on to Jamestown, Kentucky. FRUIT alleges that the carriers failed to deliver the cargoes to FRUIT.

FRUIT's Amended Complaint alleges three causes of action: Negligence (Count III); Breach of Bailment (Count V) and Breach of Contract (Count I) against ARAWAK. On January 9, 1997, ARAWAK filed its Motion to Dismiss the counts for Negligence and Bailment. On December 5, 1997, this Court granted ARAWAK's Motion to Dismiss as to the count for Negligence (as being violative of the Economic Loss Rule) and denied the Motion, without prejudice, as to the count for Bailment based upon the Court's finding that the factual record was not yet sufficiently developed as to FRUIT's knowledge and consent to the use of SEASIDE as a sub-contractor/sub-bailee.

The Plaintiffs' cargoes were comprised of cotton tee-shirts and baseball jackets. FRUIT had completed the process of manufacturing the cargoes in the nation of Jamaica. They were loaded into a total of four (4) standard forty-foot (40′) ocean shipping containers belonging to ARAWAK in Kingston, Jamaica. These four ocean containers were loaded onto vessels under charter to ARAWAK and were conveyed to Port Everglades, Florida on various dates in August or September, 1995.

These cargo movements were part of many hundreds of other similar shipping movements which ARAWAK had performed for FRUIT during the course of the 1995 calendar year. At the time of the loss, numerous other FRUIT cargoes were in various stages of transit with ARAWAK.

Upon arrival at Port Everglades, the cargo was removed from the ocean containers and "trans-loaded" into two standard fifty-three foot (53′) highway tractor-trailers operated by the trucking company, SEASIDE. As these two trucks passed through Martin County, Florida during their transit from South Florida to FRUIT's distribution center in Jamestown, Kentucky, they were hijacked. Both of the tractor-trailers were subsequently found empty and abandoned near Interstate 95. The Federal Bureau of Investigation (FBI) conducted a criminal investigation and later recovered a portion of the cargoes from persons in South Florida who purchased some of the cargo from unknown persons.

Made part of the evidentiary record as exhibits to ARAWAK's Motion are the following:

1) four Bills of Lading issued by ARAWAK, and which specify the four ocean containers which moved the cargoes from Kingston, Jamaica to Port Everglades, Florida;

2) two "Dock Receipts" which document the portions of the cargo which were transloaded from the ocean containers into the fifty-three foot (53′) highway tractor-trailers in Port Everglades;

3) relevant portions of the terms and conditions contained on the back of the Bills of Lading issued by ARAWAK;

4) the reports of a marine cargo surveyor, Mr. Ralph Wood, who was employed by FRUIT or its insurer, which describe the factual circumstances surrounding the hijackings of the two tractor-trailers;

5) the affidavit of FBI Special Agent Jay T. Miller prepared in respect to the application to this Court for the criminal

search warrant which ultimately recovered a portion of the cargo.

None of the parties have entered any evidence which would challenge either the relevancy or the authenticity of these documents. The record also includes the deposition transcripts of Richard Collins, who appeared as the Rule 30(b)(6) corporate designee for FRUIT, Mr. Jose Vega, who appeared as the Rule 30(b)(6) corporate designee of SEASIDE, FBI Agent Miller and Mr. Wood.

FRUIT contends that the transportation contract with ARAWAK was an "intermodal," or "through" Bill of Lading, which causes the ocean carrier ARAWAK to be contractually bound to move the cargoes from Kingston, Jamaica to Jamestown, Kentucky. The contract is intermodal by virtue of the single contract of carriage applying to both the ocean carrier ARAWAK as well as to the inland motor carrier SEASIDE.

As a sub-contractor, SEASIDE claims that it has never been in privity of contract with FRUIT, and claims that its legal obligations to FRUIT are governed by and subject to the Ocean Bill of Lading. There is no record evidence of any other transportation contract which would govern the relationship between FRUIT and SEASIDE, except this Ocean Bill of Lading.

FRUIT alleges that ARAWAK breached the transportation contract by not delivering the cargoes to Jamestown, Kentucky. ARAWAK concedes that the cargoes did not arrive in Jamestown, Kentucky, but asserts that it is not liable for the loss of the cargoes because the parties had specifically agreed prior to the shipments that the risk of any loss due to criminal acts would be borne by FRUIT.

ARAWAK has placed into the record factual evidence documenting:

1) the criminal hijackings of the cargoes as the two trucks passed through Martin County, Florida ("Ralph Wood Reports"); and

2) the relevant terms and conditions of the Bill of Lading relating to risk of loss from "thieves [and] assailing thieves."

FRUIT's intent to be bound by the terms and conditions of the Bill of Lading can be found in the fact that FRUIT purchased first party cargo loss insurance with an identical "assailing thieves" provision, under which it has recovered

## ANALYSIS

Federal Courts shall grant summary judgment when no issue of material fact exists and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and Fed R. Civ. P. 56(c). All reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.).

While the burden on a party seeking summary judgment is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986). A mere sliver of evidence in favor of the party opposing the motion for summary judgment, or evidence that is merely colorable or not significantly probative, is insufficient to defeat a properly supported motion for summary judgment. Despite the presumption in favor of the non-moving party, it must be borne in mind that the purpose of Rule 56 is to eliminate the needless delay and expense to the parties and the Court occasioned by an unnecessary trial.

There are no remaining claims based upon tort or negligence. The testimony FRUIT's Rule 30(b)(6) corporate representative establishes that FRUIT was aware of and consented to the use of SEASIDE as a sub-bailee. Based upon these undisputed facts and this Court's previous ruling in its Order of December 5, 1997,

the Court dismisses the claim for Bailment as to ARAWAK.

This case involves two sophisticated corporate parties who entered into a transportation contract which allocated the risks of loss from hijackings to be borne by the shipper, FRUIT. FRUIT presents two arguments why the terms of the contract should not be applied and why the carriers should bear the risk of these particular losses. First, FRUIT claims that the transportation agreement it entered into with ARAWAK was a "contract of adhesion," thus excusing FRUIT from the consequences of its terms and conditions. Second, FRUIT argues that there is circumstantial evidence that the hijackers may have obtained "inside information" or otherwise conspired with an employee of one of the carriers to hijack these cargoes. FRUIT argues that for this reason the risk of loss should be shifted back to the carrier.

As to FRUIT's first theory, the deposition testimony of FRUIT's Rule 30(b)(6) corporate designee shows FRUIT to be a large, sophisticated, international shipper holding a bargaining position entirely inconsistent with a party claiming to need protection from a "contract of adhesion." As to the its second theory, FRUIT's argument is that if one of the carriers' employees had been secretly "moonlighting" as a hijacking conspirator then this should be imputed to the carriers to excuse FRUIT from its contractual agreement to bear the risk of loss from hijacking. However, FRUIT has offered no evidence to support this argument.

As stated previously, there is no disputed issue of fact that FRUIT was aware of, and consented to, the use of SEASIDE as intended sub-bailee of the cargoes. Therefore, the only remaining basis for FRUIT's claim of recovery against ARAWAK arises from the transportation contract which is ARAWAK's Ocean Bill of Lading.

 FRUIT has the burden of proving the contract was one of adhesion. *Meeting Makers, Inc. v. American Airlines, Inc.*, 513 So.2d 700 (Fla. 3rd DCA 1987). FRUIT must establish that it was presented with a "take it or leave it" contract, and that it was without sufficient bargaining power to change any of the terms of the contract. The record disputes this fact. FRUIT is a large, sophisticated shipper who had previously shipped with ARAWAK hundreds of times under the same terms and conditions of ARAWAK's Bill of Lading. Further, FRUIT's practice was to have its attorneys review the carrier's Bill of Lading prior to shipment, and negotiate changes when it believed necessary.

A through bill of lading is:

...a contract, issued by the initial carrier, which controls the manner of shipment to destination. (citation omitted) This type of shipment is in contrast to one in which each connecting carrier enters into separate contracts with the shipper and for which it would be anomalous to hold the initial carrier responsible... [I]t is questionable whether any new bills issued by a connecting carrier would be valid as they would not alter the terms of the initial bill. See, *Mexican Light and Power Company v. Texas Mexican Railway Company*, 331 U.S. 731, 67 S.Ct. 1440, 91 L.Ed. 1779 (1947).

Both Bills of Lading issued by ARAWAK showed the final destination as Jamestown, Kentucky, consigned to FRUIT. Further, ARAWAK contracted directly with SEASIDE to transport the subject shipments from Port Everglades, Florida to Jamestown, Kentucky. SEASIDE was to be paid by ARAWAK for its services.

The reverse side of ARAWAK'S Ocean Bills of Lading contain the following provisions:

1. **APPLICABILITY OF BILL OF LADING.** The following terms and conditions govern the contractual relationship between Carrier and Shipper with respect to the goods....

 When a Bill of Lading is issued to destination, it is a through bill and all

connecting carriage is subject to its terms. *Mexican Light & Power Co. v. Texas Mexican Railway,* 331 U.S. 731, 67 S.Ct. 1440, 91 L.Ed. 1779 (1947). As there is only one Bill of Lading which governed each of the shipments at issue and SEASIDE was a connecting carrier under each of the respective Bills of Lading, these Bills of Lading governed during the entire transit period.

The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300, *et seq.,* governs this shipment. ARAWAK'S Bills of Lading indicate that, as permitted by 46 U.S.C.App. § 1312, the parties have agreed that the Carriage of Goods By Sea Act is applicable. In Paragraph 4, Clause Paramount, the following language appears:

> **4. GOVERNING LAWS (CLAUSE PARAMOUNT).** This bill of lading is subject to the provisions in the Carriage of Goods by Sea Act of the United States .... The defenses and limitations of said Act shall apply to the goods ... before the goods are loaded on and/or after goods are discharged from the Vessel, and throughout the entire time the goods are in the custody or are the responsibility of the Carrier, whether acting as carrier, bailee, stevedore, or terminal operator.

■ Therefore, COGSA applied rather than the Interstate Commerce Act and COGSA governed during the entire transit period, including the land carriage portion of the trip after the goods were transferred from the vessel. See also, 46 U.S.C.App. § 1307 which provides:

> Nothing contained in this chapter shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

Each of ARAWAK's Bills of Lading provides:

> **5. INTERMODAL OR SUBSTITUTED SERVICE....** At all times when goods are in the care, custody or control of a connecting air, land or water carrier, such connecting carrier shall be entitled to all rights, privileges, liens, limitations of and exonerations from liability, and to optional or discretionary rights of indemnity granted to Carrier hereunder to the full extent permitted to carriers under any rules and regulations and laws relating to carriers.

> **6. PERSONS COVERED (HIMALAYA CLAUSE).** All exceptions, exemptions, defenses, immunities, limitations of liability, privileges and conditions granted or provided by this Bill of Lading, applicable tariff, or by COGSA or by any applicable statute for the benefit of the Vessels or Carrier shall also apply to and for the benefit of ... all parties performing services for or on behalf of the Vessel or Carrier as employees, servants, agents or contractors of Carrier ....

■ The parties to a bill of lading may extend a contractual benefit to a third party by clearly expressing their intent to do so. *Robert C. Herd and Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820. As SEASIDE is included within the scope of parties covered by ARAWAK'S Bills of Lading, SEASIDE'S liability is controlled by and limited as set forth in these Bills of Lading. This contractual extension of liability terms to SEASIDE comports with the Harter Act's applicability to a shipment after discharge, until "proper delivery is made to the consignee." 46 U.S.C.App. § 190.

SEASIDE is included within the scope of parties covered by ARAWAK'S Bills of Lading. Therefore, it is entitled to all of the same benefits, exonerations, and limitations available to ARAWAK, including the Exceptions Clause found at paragraph

18 of the ocean Bill of Lading. This clause provides:

**18. EXCEPTIONS CLAUSE.** Carrier shall not be liable for any loss, damage, delay or failure in performance hereunder occurring at any time, including before loading on or after discharge from the Vessel or during any voyage, arising or resulting from the happening and/or threat and/or after effects of one or more of the following: ... acts of public enemies, thieves, pirates, [or] assailing thieves ...

■ The losses of the two containers in September, 1995 due to the criminal acts of hijackers is within the specific language of the Exceptions Clause of the ARAWAK Bills of Lading. Since Paragraphs 4, 5 and 6 of the ARAWAK Bills of Lading do exactly that, SEASIDE is afforded the same protection against the actions of hijackers as ARAWAK. Paragraph 5 of the ARAWAK Bills of Lading states that SEASIDE is entitled to "all rights, privileges, liens, limitations of and exonerations from liability, and to optional or discretionary rights of indemnity granted to Carrier hereunder to the full extent permitted to carriers under any rules and regulations and laws relating to carriers."

Seaside is a "connecting carrier," and the Exceptions Clause is meant to apply not only to the vessel, but to all participating land carriers in the absence of alternative terms. The Eleventh Circuit held in *Certain Underwriters v. Barber Blue Sea Line*, 675 F.2d 266 (11th Cir.1982), that a Himalaya Clause's use of "agent" and "independent contractor" was sufficient to apply the benefits of the bill of lading to a terminal operator, particularly since it was a through bill of lading (Yokohama to Miami), and it was clear that the ocean carrier could not deliver to the port of Miami without using an agent or contractor to make the actual delivery.

In the present case, the Bills of Lading issued by ARAWAK are through bills of lading governing the entire transportation of the goods (Kingston, Jamaica to Jamestown, Kentucky). The Bills of Lading apply to connecting land carriers even though they are not parties to the contract (Paragraphs 5 and 6 of Arawak's bills of lading). Their terms envision the use of connecting land carriers to conduct this "through transportation" (Paragraph 5 of the bill of lading). The shipment from Jamaica to Kentucky could not have been effected by ARAWAK without the use of a connecting land carrier.

The parties entered into this transportation contract on equal terms of relative bargaining position. Both were on actual notice of the relevant terms and conditions, including which party would assume the risk of loss for cargoes stolen by "assailing thieves."

The cargoes were lost as a result of hijackings and the written terms of the governing contract impose and allocate the risk of loss for such an event upon the shipper (FRUIT.) This is established through the testimony contained in the reports of FRUIT's surveyor, Mr. Wood, and through the transportation contracts (Bills of Lading). The burden shifts to FRUIT, who as the Plaintiff, carries the ultimate burden of proof at trial. This concept of burden shifting under a Rule 56 Motion for Summary Judgment has been set forth by the Eleventh Circuit:

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact, or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993).

FRUIT suggests that there is circumstantial evidence to indicate an employee of either SEASIDE or ARAWAK might have provided particulars about the move-

ments of the cargoes to the truck hijackers and that this constitutes a disputed issue of fact. However, there is no claim for conversion or civil theft against any of the Defendants in the Amended Complaint. There is no record evidence that any of the Defendants have benefited as a result of FRUIT's loss. There is no cause of action in tort based upon "negligent retention" or "negligent hiring" in the Amended Complaint. FRUIT's cause of action for is for breach of contract by ARAWAK.

The transportation agreement between these parties was not a promise by the carriers to preclude every conceivable type of harm from which could occur to FRUIT's cargo. The essential terms of the transportation contract between this carrier and shipper are FRUIT's promise to pay money (freight charges) to ARAWAK in return for ARAWAK's promise to provide transportation services from Kingston, Jamaica to Jamestown, Kentucky. This case concerns who will bear the risk of loss when the goods, which were the subject of the transportation agreement, were stolen by armed hijackers.

The record establishes that up until the hijacking, both ARAWAK and SEASIDE were working diligently to earn their freight revenue. ARAWAK's vessels had transported the goods as far as Port Everglades, Florida, and SEASIDE's trucks were moving the goods on the final leg of their journey. There is no evidence that ARAWAK breached its agreement to provide those transportation services to FRUIT.

This Court's previous Order of December 5, 1997 not only dismissed FRUIT's Count for Negligence, but also struck the following language contained in FRUIT's Count for Breach of Contract: "... or was otherwise at fault." FRUIT has not presented any genuine material facts to support its "fault based" cause of action which would make their conspiring employee theory relevant.

The only evidence referred to by FRUIT on this issue is the testimony of its own surveyor, Mr. Wood, who stated at his deposition that the crimes must have been committed with the assistance of an employee of one of the carriers. FRUIT has not designated Mr. Wood as an "expert witness" under Rule 26(a)(2) and this opinion by Mr. Wood has no basis in fact in respect to the record submitted to this Court.

Prior to these hijackings, ARAWAK had operated a continuous "logistics loop" for FRUIT which consisted of moving pieces of cut clothing material from FRUIT's facilities in the United States to sewing facilities in Jamaica. In Jamaica, the cut clothing material was removed from the ARAWAK shipping containers which were then re-loaded with finished clothing for the return trip back to FRUIT's facilities in the United States. ARAWAK had conducted hundreds of similar shipments during calendar year 1995 before these hijackings. There were numerous other FRUIT cargoes were at various stages of shipment in the "loop". There is no evidence that any prior shipment were victimized by hijackers.

According to Mr. Wood's deposition testimony and his written reports, the first hijacking occurred shortly before midnight on September 16, 1995 at a public rest stop located near mile marker 130 off Interstate 95 in Martin County, Florida. This rest stop was patrolled by night time security personnel employed by the State of Florida. It was the usual practice of the SEASIDE driver to utilize this public rest stop facility as the first stop after leaving Miami on his route to Jamestown, Kentucky.

While at the rest stop, an unknown individual opened the door to the cab, climbed in, brandished and handgun, and forced the driver to drive the truck back onto I–95. After forcing him to drive approximately twenty-two miles down the interstate, the hijacker directed the driver to pull over to the side of the road and remove his shoes. The barefooted driver was then left on the side of the interstate in the darkness. Later, the empty truck was

located in a nearby county and the cargo was missing.

After this single hijacking incident, there obviously did not exist any "pattern," or any indication that the hijackers had struck the truck other than randomly, possibly anticipating a cargo more lucrative than cotton tee-shirts. This takes into consideration the many other transports that were in various stages at that time involving these same parties.

Four days later, another SEASIDE driver set out on one of the routine trips bound for FRUIT's Jamestown, Kentucky facility. This driver travelled the same route as the one driven by the previous driver. This driver also stopped to use the restrooms at the same Martin County rest stop in the early evening hours of September 20, 1995 at a time when security personnel were scheduled to be on duty. As he returned to his truck, the second driver was kidnapped at gun point and his truck stolen.

Based upon the FBI investigation conducted by Agent Miller, both drivers and the owner of SEASIDE trucking were thoroughly examined and cleared of any involvement in the hijackings. It was the opinion of Agent Miller that the same criminals had perpetrated both hijackings. He felt this was accomplished by following the trucks out of South Florida and hijacking them when they made their first stops.

Mr. Wood admitted that any inference that employees of one of the carriers had conspired with the hijackers was purely circumstantial. Mr. Wood admitted that he could not rule out the possibility that if "inside" information had in fact been obtained by the hijackers, that the information could have come from FRUIT's own employees, or the employees of FRUIT's customs house broker, all of whom would have had some information concerning the truck shipments. Nor could Mr. Wood rule out the possibility that the hijackers targeted the cargoes using no other information other than that obtained by their own covert surveillance. Consistent with the FBI investigation, Mr. Wood's report concluded that there was no information which would confirm, or strongly indicate, the involvement of any employee of any the parties in this case.

In the absence of any other evidence, no finder of fact could come to a conclusion that it is "more likely than not" that one of the carrier's employees participated in the crimes. More significantly, FRUIT fails to establish why such a factual conclusion would be legally relevant to its breach of contract cause of action. FRUIT has not made any showing, nor cited any authority, which would establish that unsubstantiated, covert criminal conduct on the part of an individual should excuse FRUIT from the terms of the transportation agreement it made with ARAWAK.

The plain language which the parties used to allocate the risk of loss for various events in this case loss due to "... thieves, pirates, assailing thieves ...," does not include any qualifications as to whether the hijackers were employees of either of the parties. It is difficult to imagine an unsolved cargo theft in which endless conjecture could not be made as to the potential identities of the criminals. One purposes of the Economic Loss Rule is to respect the rights of contracting parties to allocate the risks of economic loss among themselves, as reflected by the terms and conditions of their contract. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

One of the very reasons the parties assigned to one another, by contractual agreement, the various risks of loss was to bring a measure of predictability and certainty to their relationship. Both parties to this transportation agreement employed numerous persons who would have had knowledge of the movement of the various cargoes. Both parties were at risk that criminals could be employed by one party or the other. The unqualified language used by the parties to categorically define the risk: cargo loss due to "... thieves, pirates, assailing thieves ...," makes no

distinction as to where such a criminal might hijack the cargo Had these two parties allocated the risk of criminal hijacking to that of the carrier instead of the shipper, conjecture about the involvement of one of FRUIT's employees would have been equally unavailing to ARAWAK. The Court finds that FRUIT bargained for a transportation contract with ARAWAK wherein FRUIT assumed the risk of cargo loss resulting from criminal hijackings.

Therefore, it is

**ORDERED AND ADJUDGED** that FRUIT's Motion for Summary Judgment (DE# 60) be **DENIED,** that ARAWAK's Motion for Summary Judgment (DE# 70) be **GRANTED** and that SEASIDE's Motion for Summary Judgment (DE# 68) be **GRANTED.**