Sheldrake v. Skyline Corp., No. S1269-01 CnC  (Norton, J., June 23, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    SUPERIOR COURT
Chittenden County, ss.:                          Docket No. S1269-01 CnC


SHELDRAKE

v.

SKYLINE CORP.


ENTRY


        Following the denial of their application for class action status, Plaintiffs Roger and Holly Sheldrake have moved for partial summary judgment based on the defendant's lack of cooperation with the Sheldrakes's discovery requests.  Defendant Skyline Corporation has also moved for partial summary judgment on the Sheldrakes warranty and negligence claims.  As there are no issues of material fact in either request, summary judgment is appropriate at this time.  <u>Donnelly v. Guion</u>, 467 F.2d

290, 293 (2d Cir. 1972) ("A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried.")

This is a leaky roof case. The Sheldrakes purchased their mobile home from the Skyline Corporation in November 1995 through a local Vermont dealer. Soon thereafter the couple noticed ice forming on the roof and water leaking into the house. They began complaining to the Vermont dealer, who made some minor repairs, but soon began contacting Skyline directly about ice build-up on the roof, inadequate blocking and anchoring of the home, leaking ceiling, leaking skylight, electrical problems, rotting roof, and clogged drains. These calls began in early 1996 and continued throughout the year into 1997. Along with their mobile home, the Sheldrakes received a homeowners' manual, which contained a warranty for any manufacturing defects up to one year and ten days. The manual also included a registration card that, if returned, would extend the Skyline Warranty for more three months. It is not clear , however, from the evidence and affidavits whether or not the Sheldrakes returned this registration card.

On October 25, 2001, the Sheldrakes filed their complaint against. Skyline, the dealer who sold them the mobile home, and individual corporate officers of Skyline. The Sheldrakes also filed for class action status claiming that their claims were indicative of a wider defects indicative to Skyline mobile homes and render them unsuitable for sale and use in New England. On December 2, 2002, this court dismissed the claims against the individual defendants. On March 29, 2004, this court also denied Plaintiffs' class action petition.

Presently, the parties have competing motions for summary

judgment, as well as several discovery issues, pending. Many of these discovery issues stem from a lack of clarity over the fate of the competing summary judgment motions. To that, this court hopes to resolve some of the confusion and clear the path for the parties to resolve their pre-trial disputes.

The first argument that Skyline raises concerns the economic loss rule and the plaintiffs' claims of negligence. The remedy that the Sheldrakes seek in this case is only the cost of either their mobile home or its replacement. They do not, or have not, claimed physical injuries or specified personal property that was damaged as a result of the alleged negligence. They are also raising the claims of negligence within a relationship that was primarily commercial as the parties were buyer and seller (and seller's dealer) in a consumer transaction. These issues raises the economic loss rule as a potential bar to the Sheldrakes' recovery in negligence. This rule works to keep tort law out of commercial or consumer transactions where contract law controls. See, e.g., S. Gardner & M. Sheynes, The Moorman Doctrine Today: A Look at Illinois' Economic-loss Rule, 89 Ill. B.J. 406, 406 (2001) ("The practical application of this rule bars consequential damages not necessarily intended by the parties at the time of making the contract, as well as punitive damages, which typically are not recoverable in contract, unless the conduct allegedly in breach can be characterized as an independent tort."); E. Ballinger, Jr. & S. Thumma, The History, Evolution and Implications of Arizona's Economic Loss Rule, 34 Ariz. St. L.J. 491, 492–93 (2001) ("[T]he economic loss rule is one of several principles that have evolved to define the boundaries of both contract and tort and to ensure a proper and vital role for both bodies of law."); T. Yocum & C. Hollis, III, The Economic Loss Rule in Kentucky: Will Contract Law Drown in a Sea of Tort?, 28 N. Ky. L. Rev. 456, 459 (2001) ("[Kentucky's Economic Loss Rule] recognizes a mutual

exclusivity between claims sounding in contract and tort, encouraging sophisticated parties entering into contracts to bargain now rather than sue in tort later."); S. Tourek, et al., Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation, 84 Iowa L. Rev.875 (2001) ("The Economic Loss Doctrine is a judicially created doctrine that provides commercial purchasers of goods cannot recover damages that are solely economic losses from manufacturers of those goods under 'tort' theory."). The purpose is to prevent plaintiffs from using negligence or strict liability to do an end-run around the tighter requirements of contract and warranty law, where parties can predict and shift their risk of loss accordingly. In other words, the economic loss rule is a stabilizing principle to keep the "soft" analysis of policy and duty under tort law away from parties who have had the opportunity to bargain for the risk or who can rely on a set of rules to supply any missing terms in a predictable manner. See, e.g., 9A V.S.A. §§ 2-313–2-316 (U.C.C. warranty law).[1]

Similarly, the major Vermont cases enunciating the Economic Loss Rule have involved parties whose primary relationship was contractual. Springfield Hydroelectric Co. v.Copp, 172 Vt. 311, 314 (2001) ("As our caselaw makes clear, claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract."); Gus' Catering v. Menusoft, 171

---

[1] Historically, the Economic Loss Rule developed as a judicial check on § 402A strict liability. Springfield Hydroelectric Co. v.Copp, 172 Vt. 311, 314–15 (2001). In such situations, a contract was always involved because the defendant was the seller or manufacturer whose connection to the plaintiff was through a sale. While the Rule has since spread to areas of tort law such as negligence, id., it has in nearly all cases kept this initial and significant connection to contract law.

Vt. 556 (2000) (mem.) (refusing damages for negligence to customer who bought software which was negligently installed); Paquette v. Deere & Co., 168 Vt. 258, 260–64 (1998) (applying the doctrine to a strict liability claim for a defective motor home purchased from defendant manufacturer); Breslauer v. Fayston Sch. Dist., 163 Vt. 416, 421–22 (1995) (denying negligence claim for economic losses for breach of employment contract); see also East River Steamship Corp. v. Transamerica Delaval, 476 U.S. 858, 870–71 (1986) (limiting damages to the cost of the product and not consequentials "[w]hen a product injures only itself."). In each of these cases, the courts had the separation of contract and tort law as an underlying interest.

Here the Sheldrakes' claims are classic economic losses. They are claiming damages for harm caused by and to the very product which they negotiated for, contracted about, and purchased from Skyline. The source and object of their claim, like East River Steamship, is the very same object of their agreement. It does not involve personal injury or damage to other property. Moreover, this claim is about alleged defects and product failures, not an accident or unexpected losses such as traditional tort and negligence law covers. See, e.g., People Express Air., Inc. v. Consol. Rail Corp., 495 A.2d 107, 111–12 (N.J. 1985) (refusing to apply the Economic Loss Rule in a pure accident situation). This leaves the Sheldrakes' negligence claims squarely within the purview and purpose of the Economic Loss Rule.

The Sheldrakes argue that notwithstanding their contractual relationship with Skyline and the warranty-nature of their claims the court should apply a risk-of-harm analysis that was discussed as dicta in the Paquette case. 168 Vt. at 261–63. Risk-of-harm analysis is essentially an exception to the economic loss rule where, notwithstanding the contractual

nature of the underlying relationship and claims, plaintiffs can seek a remedy in negligence or products liability under certain circumstances. Traditionally courts look to three factors: "the nature of the defect, the type of risk, and the manner in which the injury arose" when applying the analysis. Id. at 262 (quoting East River Steamship, 476 U.S. at 869-70). In East River Steamship, the United States Supreme Court rejected this analysis at least in the context of maritime law. 476 U.S. 858, 869–70 (1986). But in Paquette, the Vermont Supreme Court refused to adopt the higher court's reasoning and left the door open to risk-of-harm analysis where it might be needed. 168 Vt. at 263.

From the Paquette court's reasoning, however, a strong pattern emerges. In each case cited by the court to support some future risk-of-harm analysis, the defect involved a risk of death or serious personal injury and a potential tort-like accident. Id. at 262–63 (citing to Alaska and Washington cases with plane crashes and fire dangers); see also R. Fox & P. Loftus, Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later, 64 Def. Couns. J. 260, 262–63 (1997) ("Several jurisdictions permit recovery in tort if the defect creates a serious risk of death or personal injury.").

Such qualities are not met in the present case. Paquette does not stand for the proposition that risk-of-harm analysis should be expanded to any case involving the economic loss rule. Rather the Paquette court's reasoning recommends reserving risk-of-harm analysis for more tort-like factual scenarios where the relationship of the parties would be secondary to imminent harm posed by the danger of the defect. Such an analysis is not merited by either the nature of the harm or the threat of danger in this case. Therefore, the court declines to apply risk-of-harm analysis and will apply the economic loss rule to dismiss the Sheldrakes' negligence claims

against Skyline.[2]

Skyline's second argument is that the statute of limitations has run on the Sheldrakes' warranty claims. Under the Uniform Commercial Code, warranty claims must be brought within four years within the time the cause of action accrues. 9A V.S.A. § 2-725(1). The Sheldrakes purchased their mobile home on November 21, 1995. Their problems began almost immediately, and they contacted the Vermont dealer and Skyline on a regular basis over the next few months. This is important because the defects that the Sheldrakes cite in their warranty claims became clear during this period. That is the Sheldrakes "discovered" most, if not all, of the defects in their mobile home within the first few months of ownership. They do not cite to any specific defect that did not appear during this period or was not "discoverable" given the problems they claim to have had in early 1996. Rodrigue v. VALCO Enters., 169 Vt. 539, 541 (1999) (mem.).

---

[2] The court acknowledges that this "refusal" to apply risk-of-harm analysis may in a sense be a risk-of-harm analysis. This is a fine distinction, but the facts of this case are fairly clear. Regardless of the exact defect, the problems with the mobile home at issue here did not threaten the Sheldrakes' lives or pose serious physical harm. Additionally, the court is generally not persuaded that this exception to the economic loss rule applies at all here since the cases that discuss risk-of-harm have been limited to products liability and not negligence claims. The difference is important since courts have traditionally limited negligence claims to cases with a physical or distinct property injury while allowing greater leeway for product liability claims that inherently tend to encompass or encroach on warranty claims. Compare 1 D. Dobbs, The Law of Torts § 110, at 258–59 (2001), with 2 id. at § 352, at 972 (discussing the different sources and limitations on economic loss in negligence and products liability). The inevitable conclusion is the risk-of-harm analysis is a limited counterbalance to the economic loss rule in products liability cases where the larger policies of consumer protection may supercede the importance of separating tort from contract law.

The Sheldrakes argue that their warranty claims were tolled because they did not "discover" the defects in their mobile home until much later. They blame this delay on Skyline because it misrepresented the quality of its homes and their general unfitness for New England climates. These misrepresentations are drawn primarily from Skyline's promotional material that the Sheldrakes received prior to purchasing their mobile home. This language of quality, however, has less to do with an affirmative promise and is more about marketing and advertising.

While perhaps more than a mere puffing of the product, the language should have stood in sharp contrast to the problems that the Sheldrakes began experiencing almost immediately after moving in. More to the point of fraudulent concealment, for which the statute of limitation may be tolled, the Sheldrakes do not produce any affirmative statements or promises made by Skyline that prevented them from discovering the alleged defects in their home or to recognizing that their actual home differed substantially from Skyline's pre-sale statements. Troy v. Am. Fidelity Co., 120 Vt. 410, 423–24 (1958) ("[T]he fraudulent concealment of a cause of action which will postpone the running of the statute of limitations must consist of some affirmative act."). To toll the statute for the Sheldrakes based on such vague sales representations by Skyline would be the same as giving every customer at McDonald's a cause of action when their Big Mac invariably failed to live up to its airbrushed promotions. Skyline committed no affirmative act that stopped or should have stopped the Sheldrakes from realizing the defects in their mobile home.

At the very latest, the Sheldrakes' warranty claims did not run past March 3, 1997, fifteen months and ten days after their purchase when their explicit warranty from Skyline expired. By that time, the Sheldrakes had

experienced every defect claimed; had contacted Skyline and the Vermont dealer; and had affirmative notice through their owners manual that their express warranty had expired.  While the Sheldrakes cite to their communication with Skyline as the source of additional warranty promises, they cannot show any evidence that either Skyline or the Vermont dealer made explicit promises that would rise to the level of a future performance warranty.  South Burlington School Dist. v. Calcagni-Frazier-Zajchowski Architects, 138 Vt. 33, 48 (1980) ("[C]ourts will not lightly infer from the language of express warranties terms of prospective operation that are not clearly stated.").

Rather these communications are best characterized as promises and attempts to fix the Sheldrakes individual problems.  Such actions do not toll the statute of limitations.  Gus' Catering, Inc. v. Menusoft Sys., 171 Vt. 556, 558 (2000) (mem.).  Therefore, the clock on the Sheldrakes' statute of limitations under § 2-725 began running no later than March 3, 1997 and expired four years later, March 3, 2001, seven months before the Sheldrakes filed this action.

The Sheldrakes' main argument for tolling § 2-725 is that between April 2000 and October 2001, they were part of a potential class action for these claims.  This Cahee case, in which the Sheldrakes were not a named party but only part of the potential class, was filed in federal court on April 25, 2000.  Two weeks later, it was voluntarily dismissed by the plaintiffs and re-filed with the Rutland Superior Court.  That court dismissed the petition for class certification and the plaintiffs' case on December 10, 2001.  Two months before that dismissal, however, the Sheldrakes voluntarily dropped out of the potential class and filed this action.  Now the Sheldrakes want to take advantage of the tolling provisions that accompany class action petitions.

The rule that a class action tolls the statute of limitations for individual potential class members comes from two United States Supreme Court opinions.  Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.  At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending  action."); American Pipe & Construc. Co. v. Utah, 414 U.S. 538, 554 (1974) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").  The purpose behind these cases was to discourage a rush of individual cases when plaintiffs feared a class would not be certified, which would result each time in "a needless multiplicity of actions." Crown, Cork & Seal, 462 U.S. at 351.  By tolling the statute for any individual member, the Court reasoned would support the purpose of Rule 23 (class actions) allowing economy and efficiency win out over the chaotic potential of hundreds of plaintiffs instituting actions designed to preserve their rights against the possibility that the class might not be certified.  Moreover, it serves another purpose of Rule 23, by uniting the fate and interests of the class and treating potential members equal to the representative plaintiffs.

This logic, however, does not carry through when an individual plaintiff voluntarily chooses to leave the class prior to certification or dismissal of the petition.  In that case, the plaintiff has voluntarily elected to leave the class and has divorced herself from the fate of that class.  Rather than preserving unity, efficiency, and economy, allowing a plaintiff who voluntarily leaves a class prior to a determination to have the tolling benefit of the class would encourage more litigation and less solidarity.  Instead of

putting her fate in the same boat with the class, plaintiff could merely "ride" along with the class and then get out where ever she saw fit. Nearly every court that has considered this question has rejected a plaintiff's right to the tolling provision of a class action when she voluntarily leaves the class prior to the court's determination. In re Worldcom, Inc. Securities Litigation, 294 F.Supp.2d 431, 451 (S.D.N.Y. 2003) (citing federal circuit decisions); see also Catholic Social Serv., Inc. v. INS, 182 F.3d 1053, 1060–61 (9th Cir. 1999) (discussing the limits of Crown, Cork & Seal in the context of successive class actions).

In this case, the Sheldrakes only had to wait two more months to learn the fate of the Cahee petition. Even if the class had been certified, the Sheldrakes could have opted out of the class under Rule 23 and still have taken advantage of the class's tolling provision. But by opting out of the class earlier, the Sheldrakes may not take advantage of this tolling provision. They chose not to stay with their potential class. It is in conformance with the policies of Crown, Cork & Seal and American Pipe to deny Rule 23's tolling provisions to the Sheldrakes. Therefore, the Sheldrakes' warranty claims were filed out of time and are dismissed as a matter of law.

Turning briefly to the Sheldrakes' argument for summary judgment based on Skyline's refusal to answer their discovery request, it is important to note that none of the requested material touches upon the questions of discussed above. This discovery dispute goes more to the competing visions of this case held by the plaintiffs and the defendants. Much of the Sheldrakes' discovery is broad and aimed at uncovering the patterns in Skyline's customer service and customer response to its products. Neither of these facts would have changed the time-frame in which the Sheldrakes should have discovered the defects in their own home. Nor would this discovery have changed what affirmative acts the Sheldrakes could cite as a

basis for tolling the statute of limitations. Thus, any negative inferences would not help the Sheldrakes' case.

Moreover, it would be improper to draw negative inferences from Skyline's position because much of its resistance came from a good faith dispute about the scope of this case. In particular, Skyline's objections date from the time when the class certification petition was still pending. Skyline took the position that it did not have to comply with such wide discovery until the class was certified. Now that the case has been narrowed to individual action, both parties need to re-evaluate the scope of discovery.[3]

At this point, the parties' current discovery issues may or may not have been rendered moot. By granting Skyline's motion for partial summary judgment, the plaintiffs' claims have been reduced to a single count of consumer fraud. In light of this, the court will wait to make a determination about the parties pending discovery motions to compel and protect. Parties will arrange with the court for a hearing on these issues.

Based on the foregoing, defendant Skyline's motion for partial summary judgment is granted. Plaintiffs Roger and Holly Sheldrakes' cross-motion for partial summary judgment is denied.

Dated at Burlington, Vermont_____, 2005.

_____

[3] Needless to say, parties should incorporate the ramifications of this decision in their future discovery plans.

_____

Judge